**COLUMBIA RIO GRANDE HEALTH-CARE, L.P. d/b/a Rio Grande Regional Hospital, Petitioner,**

v.

**Alice H. HAWLEY and James A. Hawley, Respondents.**

No. 06–0372.

Supreme Court of Texas.

Argued Jan. 17, 2008.

Decided June 5, 2009.

R. Brent Cooper, Diana L. Faust, Devon J. Singh, Heather Jean Reynolds Johnson, Cooper & Scully, P.C., Dallas, TX, Raul Javier Guerra, Green, DuBois & Guerra, San Antonio, TX, Mike A. Hatchell and Charles R. Watson Jr., Locke Lord Bissell & Liddell LLP, Austin, TX, for Petitioner.

Darrin M. Walker, Law Office of Darrin Walker, Kingwood, TX, Laura R. Pazin Porter, Clarence V. Lyons, Loan Kim Vo, Lyons & Rhodes, P.C., San Antonio, TX, Roberto J. Yzaguirre, and Jose E. Chapa, Yzaguirre & Chapa, McAllen, TX, for Respondents.

Linda C. Breck, Corpus Christi, TX, for Amicus Curiae.

Justice JOHNSON delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice BRISTER, Justice GREEN and Justice WILLETT joined, and in all but Part II–D 2 of which Justice O'NEILL and Justice MEDINA joined.

In this health care liability case against a hospital we consider whether the trial court erred by refusing to give jury instructions as to new and independent cause, a physician's status as an independent contractor, and lost chance of survival. Concluding the trial court erred by refusing instructions on the physician's independent contractor status and lost chance of survival, we reverse and remand for a new trial.

## I. Background

On November 22, 2000, Alice Hawley visited Dr. Armando Arechiga, complaining of cramps, nausea, and vomiting. Dr. Arechiga admitted her to Columbia Rio Grande Regional Hospital ("Columbia" or "the hospital"). The next day Dr. Jesus Rodriguez operated on Alice, performed a colon resection, and sent a tissue specimen to the hospital's pathology laboratory. There, Dr. Jose Valencia, an independent

pathologist whose office was located inside the hospital, discovered Alice had cancer. He diagnosed its severity as Stage 3, or what is known as Duke's C cancer.

Because some doctors had complained of not receiving pathology reports, the hospital had adopted a written policy (the policy) in regard to notifying patients' doctors of cancer diagnoses. The policy was in place at the time of Alice's surgery and called for a copy of the pathology report to be placed in the patient's hospital record. It also specified the following:

A. PATHOLOGIST WILL VERBALLY NOTIFY PHYSICIAN(S) OF RECORD.

B. PATHOLOGY SECRETARY WILL FAX REPORT TO PHYSICIAN(S) OF RECORD.

C. REPORTS WILL BE DELIVERED TO PHYSICIAN(S) OF RECORD VIA CERTIFIED MAIL.

The policy identified the "physician(s) of record" as the admitting physician and the surgeon, if the surgeon was not the admitting physician. In this case, the physicians of record were Drs. Arechiga and Rodriguez.

Alice's medical records and the pathology lab records showed the pathology report was placed in her hospital chart one day before she was discharged, although Dr. Arechiga did not see it when he completed his discharge summary. The hospital disputes whether all parts of its written notification policy must be complied with as to each cancer diagnosis, and the parties disagreed as to whether all parts were actually complied with in Alice's particular case. However, there is no dispute that Alice was not told she had cancer and did not receive treatment for cancer until long after the initial diagnosis by Dr. Valencia.

During a routine checkup in the summer of 2001, Dr. Arechiga found Alice's liver enzymes to be elevated. The enzymes were much higher when she returned for another appointment in September, so Dr. Arechiga ordered tests that revealed she had liver cancer. Even though treatment began immediately, the disease was terminal.

Alice and her husband, James Hawley, sued the hospital, Dr. Rodriguez, and Dr. Valencia. They alleged the hospital was negligent in failing to timely and properly convey the cancer diagnosis to Alice and Drs. Rodriguez and Arechiga and in failing to follow its policies and procedures for reporting the pathology results. The Hawleys nonsuited the doctors before trial.

The case was tried to a jury. The jury found that Columbia's negligence was a proximate cause of Alice's injuries. The trial court entered judgment against Columbia based on the jury verdict. The court of appeals affirmed. 188 S.W.3d 838.

Columbia argues that the trial court erred in charging the jury, failing to cap the damages, and applying an improper interest rate to the judgment. It asserts charge error based on the trial court's refusal to give jury instructions as to: (1) new and independent cause, (2) the independent contractor status of Dr. Valencia, and (3) lost chance of survival.

## II. The Jury Charge

### A. General Law

■ A trial court must, when feasible, submit a cause to the jury by broad-form questions. TEX. R. CIV. P. 277. It is also required to give "such instructions and definitions as shall be proper to enable the jury to render a verdict." *Id.* An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.

2000). Determining necessary and proper jury instructions is a matter within the trial court's discretion, and appellate review is for abuse of that discretion. *Shupe v. Lingafelter,* 192 S.W.3d 577, 579 (Tex. 2006). One way in which a trial court abuses its discretion is by failing to follow guiding rules and principles. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998).

 A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts. Tex.R.App. P. 61.1. Charge error is generally considered harmful if it relates to a contested, critical issue. *See Bel–Ton Elec. Serv., Inc. v. Pickle,* 915 S.W.2d 480, 481 (Tex.1996) (per curiam); *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.,* 843 S.W.2d 470, 472 (Tex.1992).

## B. New and Independent Cause

█ New and independent cause is a component of the proximate cause issue. *See Dallas Ry. & Terminal Co. v. Bailey,* 151 Tex. 359, 250 S.W.2d 379, 383–84 (1952) ("The theory of new and independent cause is not an affirmative defense; it is but an element to be considered by the jury in determining the existence or non-existence of proximate cause."). A new and independent cause of an occurrence is the act or omission of a separate and independent agent, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question. *See Dew v. Crown Derrick Erectors, Inc.,* 208 S.W.3d 448, 450–51 (Tex.2006); *Dillard v. Tex. Elec. Coop.,* 157 S.W.3d 429, 432 n. 3 (Tex.2005).

Columbia contends the trial court should have instructed the jury on new and independent cause because the doctors' failure to review the pathology report was a new and independent cause that produced injuries which otherwise would not have occurred. It asserts evidence showed the pathology report was sent to Dr. Arechiga, and his failure to review that report, as well as the doctors' failure to review the report in the hospital records for eleven months, was not reasonably foreseeable. Columbia further points out that although the laboratory employees responsible for faxing and mailing the report could not specifically recall mailing and faxing Alice's report to the doctors, the employees testified that they invariably followed laboratory procedures in cancer cases because they recognized the importance of getting reports to the doctors. The hospital had a certified mail return receipt that correlated to Alice's pathology report number and was signed by the receptionist in Dr. Arechiga's office, but the hospital did not have a certified mail return receipt from Dr. Rodriguez's office. Both Drs. Arechiga and Rodriguez denied having seen the report even though each attended to Alice when she was hospitalized after the November 2000 surgery, and Dr. Arechiga's receptionist said she had received and filed the report in his office records on Alice. Both doctors denied having been told of the cancer diagnosis.

The Hawleys argue that the trial court properly refused the instruction because it was not supported by pleadings and because it was foreseeable that the doctors would not learn Alice had cancer unless the hospital ensured they actually received the pathology report or were told about it. The Hawleys also assert that if the trial court erred in refusing the instruction, the error was harmless because the charge permitted Columbia to argue that only the doctors caused Alice's injuries.

█ We first consider whether Columbia's pleadings supported the instruction.

After the Hawleys nonsuited Drs. Rodriguez and Valencia, Columbia pled, in part, new and independent cause. The Hawleys specially excepted to the pleadings because Columbia did not specify what the alleged new and independent causes were. Columbia amended and alleged various specific acts of negligence by Drs. Arechiga, Rodriguez, and Valencia as new and independent causes. The trial court ruled that evidence of the physicians' actions would be admissible, but their actions could not be characterized to the jury as negligence. Later, when Columbia requested the new and independent cause instruction at the charge conference, the Hawleys did not object on the basis that there were no pleadings to support it. We conclude Columbia's pleadings were sufficient to support the instruction if it was otherwise proper.

We next address whether the failure to submit the instruction was error. Columbia contends that even assuming it failed to completely comply with the different parts of its notification policy, it was not foreseeable that Alice's doctors would be unaware of her cancer because (1) the pathology report was unquestionably placed in Alice's hospital records before she was dismissed from the hospital in November and before Dr. Arechiga prepared her discharge summary; (2) a certified mail return receipt showed the report had been timely received by Dr. Arechiga's office; (3) Alice was hospitalized for additional surgery by Dr. Rodriguez in January 2001 to close the colostomy left from the November surgery, and at that time the pathology report was in her records from the earlier surgery; and (4) Alice returned to the hospital on several other occasions between November 2000 and October 2001 [1] under the care and treatment of Drs. Arechiga and Rodriguez and neither doctor requested or reviewed her complete medical chart that contained the cancer diagnosis.

 If the act or omission alleged to have been a new and independent cause is reasonably foreseeable at the time of the defendant's alleged negligence, the new act or omission is a concurring cause as opposed to a superseding or new and independent cause. *Dew*, 208 S.W.3d at 451. A new and independent cause alters the natural sequence of events, produces results that would not otherwise have occurred, is an act or omission not brought into operation by the original wrongful act of the defendant, and operates entirely independently of the defendant's allegedly negligent act or omission. *Id.* In analyzing whether an intervening cause is new and independent, rather than superseding, we have looked for guidance to factors set out in section 442 of the Restatement (Second) of Torts:

(a) the fact that the intervening force brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

---

1. For example, the record reflects that Dr. Arechiga hospitalized Alice in March 2001 for deep vein thrombosis.

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

See RESTATEMENT (SECOND) OF TORTS § 442 (1965); *Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex.1999).

▮ In this case, the alleged intervening forces are the failure of Alice's treating doctors to review her hospital records and see the pathology report, their failure to fulfill their independent duties to inquire about the pathology results, and the failure of Dr. Arechiga to review his own office records and see the pathology report filed there by his office staff. In substance, the alleged intervening forces are the failures of the treating doctors to make inquiry and find out the results of the pathology laboratory's examination. There was evidence the treating doctors had an independent duty to do so.

▮ The doctors' failures to independently follow up, analyzed according to the above factors, respectively, (a) did not implicate a different risk of harm than the hospital's failure to ensure the doctors knew of the pathology report because both failures implicated the risk that Alice's cancer would go untreated; (b) did not later appear to yield extraordinary consequences in view of the circumstances at the time of the cancer diagnosis because the cancer predictably progressed as a result of both failures; and (c) were not completely independent from the risk created by the hospital's negligence—that Alice's cancer would go untreated—even though the doctors' actions and failures to act were independent of Columbia's actions. The doctors' failures to discover the cancer report were (d) due to their own lack of inquiry about the report and (e) wrongful toward Alice and could have possibly subjected them to liability. However, the doctors' alleged negligent actions and omissions, even assuming they made the doctors culpable, did not necessarily make their conduct a superseding cause. The "threshold and controlling" inquiry when determining whether a cause is new and independent remains " 'whether the intervening cause and its probable consequences were such as could reasonably have been anticipated by the original wrongdoer.' " *Dew*, 208 S.W.3d at 452 (quoting *Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex.1968)); *see also* RESTATEMENT (SECOND) OF TORTS § 447 (1965) ("The fact that an intervening act of a third person is negligent in itself ... does not make it a superseding cause ... if the actor at the time of his negligent conduct should have realized that a third person might so act."). The doctors' alleged culpability in failing to follow up and inquire as to the pathology report did not change the risk—that Alice's cancer would go untreated—created by the hospital's actions in November 2000.

In regard to whether the hospital should have foreseen the failures of Drs. Arechiga and Rodriguez to inquire about or review the report, Dr. Stephen Tucker testified that it was within the scope of a physician's responsibility to follow up on a pathology report and that it was unforeseeable a doctor would not do so. However, his testimony must be considered in light of uncontroverted evidence that the hospital was aware doctors did not always follow up on specimens sent to the pathology lab. According to the laboratory medical director, the hospital implemented its written notification policy due to complaints from doctors that for some reason they were not getting pathology reports. The written policy with redundant notification

measures was adopted to ensure appropriate doctors were aware of cancer diagnoses. Thus, the evidence conclusively established it was reasonably foreseeable to the hospital that some physicians might be unaware, and remain unaware, of a cancer diagnosis unless Columbia ensured the physicians were aware of it.

Finally, where the risk resulting from the intervening act is the same risk resulting from the original actor's negligence, the intervening act cannot be classified as a superseding cause. *Dew*, 208 S.W.3d at 453. Here, the risk of harm from the doctors' failure to determine the results of the pathology examination was the same risk that the hospital's notification procedures were designed to eliminate: lack of timely treatment for a patient's cancer. But while the circumstances surrounding these doctors' lack of knowledge as to the cancer diagnosis might be highly unusual, the risk of harm from the report remaining undetected by the doctors for eleven months is the same as the risk of harm created by the hospital's failure to notify the doctors of the cancer finding in the beginning: Alice's cancer was not treated timely.

We conclude that because the doctors' extended failures to become, or be made, aware of Dr. Valencia's cancer diagnosis were reasonably foreseeable to the hospital, they were concurring, not superseding, causes of the delay in Alice's cancer treatments. Thus, the trial court did not abuse its discretion by refusing to submit a new and independent cause instruction.

## C. Loss of Chance

### 1. Failure to Give the Instruction

■ The court's charge in this case defined "proximate cause" as follows:

"Proximate cause," when used with respect to the conduct of [the hospital], means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a hospital using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of any event.

Columbia argues that because the evidence of Alice's chance of survival at the time of Dr. Valencia's cancer diagnosis was conflicting, the court erred in refusing to give the following additional instruction:

You are instructed that Alice H. Hawley must have had greater than a fifty percent (50%) chance of survival on November 28, 2000 for the negligence of Rio Grande Regional Hospital to be a proximate cause of injury to Alice H. Hawley.

The Hawleys do not assert that Columbia's requested instruction was an incorrect statement of the law or that the issue was not raised by the evidence. Rather, they argue (1) because the court's proximate cause definition specified that Columbia's negligence could not be a proximate cause of Alice's injuries unless her injuries would not have occurred absent the negligence, the definition adequately instructed the jury on the issue of causation and the requested instruction would have been redundant and would not have further assisted the jury; and (2) the lawyers argued to the jury that under the law, the Hawleys had the burden to prove Alice probably would have survived the cancer if the defendant's negligence had not resulted in delayed treatment. Citing *Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex.1984), the Hawleys urge the charge was sufficient and should not have been embellished because it tracked the language of the pattern jury charge. *See id.* ("Judicial histo-

ry teaches that broad issues and accepted definitions suffice and that a workable jury system demands strict adherence to simplicity in jury charges."). We disagree with the Hawleys' contentions.

■■■ Recovery in a medical malpractice case requires proof to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant. *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995). Proximate cause includes two components: cause-in-fact and foreseeability. *LMB, Ltd. v. Moreno,* 201 S.W.3d 686, 688 (Tex.2006) (per curiam). Proof that negligence was a cause-in-fact of injury requires proof that (1) the negligence was a substantial factor in causing the injury, and (2) without the act or omission, the harm would not have occurred. *Id.* These standards bar recovery by a patient if a condition preexists the negligence of a health care provider and at the time of the negligence, the condition resulted in the patient having a 50% or less chance of cure or survival. *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 400 (Tex.1993).

The parties address the loss of chance question as a lost chance of survival even though Alice was alive at the time of trial. We will address the issue as the parties have briefed and presented it for two reasons. First, no one disputed that at the time of trial Alice's disease was terminal. Second, whatever injuries she suffered from the alleged negligence of the hospital, the Hawleys' burden of proof was the same—they had to prove that the hospital's actions were a cause-in-fact of injuries above and beyond those Alice would have suffered even if she had received treatment promptly after Dr. Valencia's diagnosis in November 2000. *See id.* at 398 ("The principal issue presented in this case is whether Texas permits recovery for lost chance of *survival or cure* in medical malpractice cases; that is, whether there is liability for negligent treatment that decreases a patient's chance of avoiding *death or other medical conditions* in cases where the adverse result probably would have occurred anyway.") (emphasis added).

In *Kramer,* the Court was faced with the issue of whether to adopt the loss of chance doctrine as part of Texas common law:

[T]he Survival Statute does not create a new cause of action. Rather, it simply provides that "[a] cause of action for personal injury to the health, reputation, or person of an injured person" survives the death of the injured party "to and in favor of the heirs, legal representatives, and estate of the injured person." TEX. CIV. PRAC. & REM.CODE § 71.021. Assuming we were to adopt the loss of chance doctrine as part of the common law, Ms. Kramer's cause of action for damages from her lost chance, if any existed, would survive under this statute. Therefore, to determine whether the court of appeals erred in refusing to reverse the trial court's denial of the Kramers' proposed special issue 8, *we must consider whether Texas should adopt the loss of chance doctrine as a part of its common law.*

*Id.* at 404 (emphasis added). The Court held that recovery for a loss of chance required proof that at the time of the defendant's alleged negligence, there was less than a 50% chance the claimed injuries would have occurred without that defendant's negligence. *Id.* at 406–07. In reaching its holding, the Court reviewed various approaches taken by jurisdictions and commentators in valuing and proving a lost chance of avoiding harm when a condition such as cancer preexisted the defendant's alleged negligence. *Id.* at

405–06. It considered and rejected an approach that

> conceptualizes the lost chance of survival or improved health as a distinct, compensable injury, creating a separate cause of action for its recovery. As one commentator explained:
>
>> To illustrate, consider a patient who suffers a heart attack and dies as a result. Assume that the defendant-physician negligently misdiagnosed the patient's condition, but that the patient would have had only a 40% chance of survival even with a timely diagnosis and proper care. Regardless of whether it could be said that the defendant caused the decedent's death, he caused the loss of a chance, and that chance interest [would] be completely redressed in its own right.

*Id.* at 402 (citations omitted) (quoting Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 YALE L.J. 1353, 1382 (1981)). Under such an approach, damages are awarded based on valuation of any loss of chance, even if the lost chance was as small as 1%. The Court rejected that approach as well as similar ones allowing recovery without proof that the defendant's negligence caused more than a 50% loss of chance of avoiding injuries above and beyond those that would have occurred anyway. *Id.* at 400–02, 407. Thus, proof that a patient lost *some* chance of avoiding a medical condition or of surviving the cancer because of a defendant's negligence is not enough for recovery of damages.

The testimony as to Alice's loss of chance was inconsistent and the Hawleys do not dispute that the parties hotly contested her probability of a cure or survival had she immediately begun treatment following Dr. Valencia's diagnosis in November 2000. For example, Dr. Escudier began treating Alice for cancer in November 2001, a year after Dr. Valencia's diagnosis. She estimated Alice had a 60% five-year survival rate in November 2000 and based her estimate on the cancer having been at the Duke's C stage when it was first diagnosed. Dr. Marek, who began treating Alice in December 2001, testified that Alice would have had a 65% chance of being cured had she begun treatment immediately following Dr. Valencia's diagnosis. However, the hospital's witnesses, Drs. Eric Raefsky and Thomas Wheeler, testified that even with immediate treatment in November 2000, Alice's chance of survival was 50% or less. Dr. Raefsky testified that her chances for survival were not greater than 25% to 50% because in his opinion the cancer had already spread from the colon. Dr. Wheeler was of the opinion that the cancer had already progressed to Stage 4, or Duke's D, had spread to her liver, and her survival rate was about 20% at the time of the diagnosis.

 The Hawleys contend the trial court did not need to instruct the jury that in order for Columbia's negligence to be a proximate cause of injury to Alice, she must have had a greater than 50% chance of surviving the cancer because the lawyers explained that was the law. But the jurors took oaths to render their verdict according to "the law as it may be given to you in the Charge of the Court" and evidence submitted under rulings of the court. *See* TEX.R. CIV. P. 236. The judge instructed the jurors that at the conclusion of the evidence, they would receive a written charge from him on the law. The charge itself instructed the jury that "in matters of law, you must be governed by the instructions in this charge" and if the jury "disregarded any of these instructions it will be jury misconduct." *See* TEX.R.

CIV. P. 226a. The jury is presumed to have followed the court's instructions. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 771 (Tex.2003) (noting that unless the record demonstrates otherwise, appellate courts must presume the jury followed instructions given in the jury charge). Statements from lawyers as to the law do not take the place of instructions from the judge as to the law. It is the trial court's prerogative and duty to instruct the jury on the applicable law.

Columbia's requested instruction would not have been redundant, as the Hawleys assert. The instruction would have provided to the jury the standard it was required by law to apply in making its finding on a hotly-contested issue. The opinion in *Kramer* highlights the subtleties among various approaches to valuing a loss of chance, the difficulty in properly framing the loss of chance issue as a legal matter, and the reason juries need to be instructed as to the law on loss of chance. As this Court stated over a century ago when considering alleged charge error, "[w]e must look at the court's charge as practical experience teaches that a jury, untrained in the law, would view it." *Galveston, H. & S.A. Ry. Co. v. Washington,* 94 Tex. 510, 63 S.W. 534, 538 (1901). It asks too much of lay jurors, untrained in the law, to distill the correct Texas legal standard for loss of chance from the general proximate cause instruction given by the trial court. Columbia's requested loss of chance instruction would have assisted the jury, was an accurate statement of applicable law, and was supported by the pleadings and evidence. *See Mandlbauer,* 34 S.W.3d at 912. The trial court abused its discretion by refusing to give it.

### 2. Harm

 One way in which a trial court's error in refusing an instruction can be reversible is if the error probably caused the rendition of an improper judgment. TEX.R.APP. P. 61.1(a); *Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 170 (Tex.2002). The instruction Columbia requested related to a contested, critical issue. *See Bel–Ton Elec. Serv.,* 915 S.W.2d at 481; *Sw. Bell Tel. Co.,* 843 S.W.2d at 472. Under the evidence, there was little question that because of the negligence as found by the jury, Alice lost some chance of cure and survival. Unless the jury applied the law as expressed in Columbia's proposed instruction, it could have found that because she lost at least some chance of reduced medical treatment and survival, even if that chance was much less than 50%, the hospital's negligence proximately caused injury to her. Such a result was specifically rejected in *Kramer.* 858 S.W.2d at 407. Considering the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety, the refusal to give the requested instruction on loss of chance was reasonably calculated to and probably did cause the rendition of an improper judgment. *See Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 843 (Tex.2005); *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986).

### D. Independent Contractor

### 1. Failure to Give the Instruction

 A hospital ordinarily is not liable for the negligence of an independent contractor physician. *Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 948 (Tex.1998). Columbia asserts the trial court erred by refusing to instruct the jury, in accordance with the foregoing principle, that the jury should not consider the actions or omissions of Dr. Valencia

when determining the hospital's negligence.

The Hawleys urge that the refusal to give such an instruction was not erroneous, even though they do not contend the hospital was liable for the actions or omissions of Dr. Valencia. They note (1) "[n]o one suggested that Valencia was an agent of the Hospital for whose conduct the Hospital could be held liable," (2) it was undisputed and repeatedly emphasized that Dr. Valencia was not a hospital employee, and (3) their lawyers did not dispute Columbia's jury argument that Dr. Valencia did not work for the hospital. The Hawleys also say the jury was instructed to consider only the acts of the hospital's employees. One problem with this assertion is that the jury instructions and liability question did not limit the jury's considerations as the Hawleys claim. The jury charge stated:

> You are hereby instructed that RIO GRANDE REGIONAL HOSPITAL acts or fails to act only through its employees, agents, nurses, and servants.

The one liability question then asked:

> Was the negligence, if any, of RIO GRANDE REGIONAL HOSPITAL, a proximate cause of injuries to Alice H. Hawley?

Columbia does not contend the trial court's instructing the jury that a hospital acts through its employees, agents, nurses, and servants was improper or a misstatement of the law. Rather, Columbia contends the jury should have also been given the following instruction to prevent the hospital from being found liable because the jury improperly considered Dr. Valencia as its agent:

> In considering the negligence of Rio Grande Regional Hospital, do not consider the acts or omissions of the pathologist, Dr. Valencia.

The evidence showed Dr. Valencia was an employee of Useda and Associates, pathologists with offices in the hospital. Dr. Useda, a member of the group, testified he was the medical director of Columbia's pathology laboratory. Drs. Useda and Valencia each testified they had input into the hospital's policy that specified the pathologist was to verbally notify doctors of record when cancer was diagnosed. Dr. Valencia testified he expected the laboratory secretaries to follow the protocol and when he came to work in the laboratory he usually reviewed the certified mail receipts from reports the secretaries had sent the day before. He also testified that only around one-fifth of physicians called about a cancer report would call the laboratory back, so many times he would not personally tell physicians of record about cancer diagnoses. Dr. Valencia could not recall specifically telling either Dr. Arechiga or Dr. Rodriguez that Alice had cancer. Both Drs. Arechiga and Rodriguez denied having been told of the diagnosis.

When considered in light of the evidence and the instruction given, the liability question allowed the jury to consider actions or omissions of any hospital "agent" when determining the hospital's negligence. The court instructed the jury that:

> When words are used in this charge in a sense which varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

There was no definition given for "agent." Thus, the jury could have considered Dr. Valencia as the hospital's agent. *See* WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 38 (1996) (defining an agent, in part, as "a person or business authorized to act on another's behalf"). The hospital's request was designed to prevent that from happening. The instruction was effective-

ly a limiting and proper definition of the term under the evidence. The requested instruction would have assisted the jury, was an accurate statement of applicable law, and was supported by the pleadings and the evidence. *See Mandlbauer*, 34 S.W.3d at 912. The Hawleys do not complain that the instruction would have "tilted" the jury against them in some manner; indeed, one reason they say the failure to give the instruction was not error is because it was undisputed that Dr. Valencia was not an employee of the hospital through whose actions the hospital acted.

In refusing to give the instruction, the trial court failed to follow guiding principles and therefore abused its discretion. We next consider whether the error was harmful.

### 2. Harm

■ Columbia asserts that failing to submit the instruction was harmful because the error prevents it from properly presenting the case on appeal. *See* Tex. R.App. P. 61.1(b) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the Supreme Court concludes that the error complained of . . . (b) probably prevented the petitioner from properly presenting the case to the appellate courts."); *see also* Tex.R.App. P. 44.1(a)(2). Columbia's position is that under the charge and record there is no way to tell if the jury found it liable because of acts of employees, agents, and servants—for whom it could properly be held liable—or because of acts and omissions of Dr. Valencia—for whom it could not. Columbia relies on the harm analysis of Rule 61.1(b) as we applied it in *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex.2000). There, we held that when a trial court submits a single broad-form liability question commingling valid and invalid theories of liability, the error is presumed harmful if an

appellate court cannot determine whether the jury based its answer on an invalid theory. *See* Tex.R.App. P. 61.1(b). Columbia claims the charge in this case effectively mixed valid and invalid theories of negligence—negligence committed by hospital agents as opposed to negligence committed by Dr. Valencia, an independent contractor.

In support of their position that *Casteel* is inapplicable here, the Hawleys cite *Columbia Medical Center of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 858–59 (Tex.App.-Fort Worth 2003, pet. denied). In *Bush*, the defendant hospital urged that the trial court erred by refusing to instruct the jury not to consider certain specific acts alleged in the pleadings to have been negligence. *Id.* at 857–58. The appeals court determined that because the only theory of liability submitted was negligence, there was not a mixing of valid and invalid theories of liability even if there was no evidence the specific acts in question were negligent. *Id.* at 858–59.

Here, as in *Bush*, negligence was the only theory of liability submitted. But here, Columbia is not complaining of the failure to instruct the jury that it should not consider specific acts as negligence. Columbia is complaining because the charge affirmatively told the jury that the hospital acted through its employees, agents, nurses, and servants and allowed the jury to speculate whether Dr. Valencia was an agent of the hospital.

■ When considered along with the instruction that the hospital acted through its employees, agents, nurses, and servants, the liability question effectively submitted four negligence questions: (1) were the hospital's employees negligent, (2) were the hospital's agents negligent, (3) were the hospital's nurses negligent, and (4) were the hospital's servants negligent.

Among other possible bases for its finding that the hospital was negligent, the jury may have found the employee laboratory assistants were negligent; it may have found the hospital's employee laboratory operations supervisor was negligent; or it may have found Dr. Valencia was negligent and determined he was an agent of the hospital. But we agree with the Hawleys that the harm question presented in *Casteel* is different from that presented here because here the charge did not submit an invalid theory to the jury. Submission of an invalid theory involves "[a] trial court's error in instructing a jury to consider erroneous matters." *Harris County v. Smith*, 96 S.W.3d 230, 233 (Tex.2002) (applying *Casteel's* analysis of an invalid liability theory to an unsupported element of damages). In *Casteel*, for example, the jury charge contained a single broad-form liability question containing instructions on thirteen independent grounds for liability, four of which were invalid because they required consumer status, which the plaintiff did not have. *Casteel*, 22 S.W.3d at 387–88.

Unlike the contentions made in *Casteel*, Columbia does not contend that the jury was allowed to consider an improper theory of liability by the charge that allowed the hospital to be held liable for actions of its agents. Thus, the presumed harm analysis of Rule 61.1(b) was applied in *Casteel* and *Harris County* to a different jury charge problem than is presented here. *See Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex.2006) ("We specifically limited our holdings in *Casteel* and *Harris County* to submission of a broad-form question incorporating multiple theories of liability or multiple damage elements."). And although in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment, *see Union Pacific Railroad Co. v. Williams*, 85 S.W.3d 162, 170 (Tex.2002), the harm analysis of Rule 61.1(b) applies here because the jury could have found Columbia liable based on Dr. Valencia's acts or omissions under the charge as given, and there is no way for Columbia or an appellate court to tell if it did so. *See Harris County*, 96 S.W.3d at 234–35. Such an error effectively precludes reviewing courts from determining whether the jury found liability on an invalid basis, precludes determination of whether the error probably caused the rendition of an improper judgment, and is harmful because it prevents proper presentation of the case on appeal. TEX.R.APP. P. 61.1(b). We sustain Columbia's issue.

### III. Limitation of Damages and Interest

Columbia also asserts that (1) the trial court failed to limit the damages in accordance with Section 11.02 of former Texas Revised Civil Statute Article 4590i [2], and (2) the judgment does not reflect proper pre-judgment and post-judgment interest rates. Because we are remanding for a new trial and these issues may not recur following that trial, we do not address them.

### IV. Conclusion

The trial court erred in refusing to submit Columbia's proposed jury instructions as to Dr. Valencia's actions as an independent contractor and as to Alice's loss of chance. The judgment of the court of

**2.** Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 11.02, 1977 Tex. Gen. Laws 2039, 2052, *repealed by* Act of June 2, 2003, 78th Leg., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

appeals is reversed and the case is remanded to the trial court for a new trial.