COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





DORIS PENROD,


 Appellant,


v.


DAVID R. SCHECTER, M.D.,
INDIVIDUALLY AND D/B/A
SCHECTER AND BLUMENFELD, P.A.,


 Appellees. 

§


 


§


 


§


 


§


 


§



§

No. 08-07-00121-CV



Appeal from


 County Court at Law No. 5


of El Paso County, Texas


(TC # 2005-206)




O P I N I O N



 Is it reversible error to permit a jury to decide a case based on an instruction that is neither
supported by the evidence, intended by the trial court, nor properly defined? Because we conclude
that it is, we reverse and remand. 

FACTUAL SUMMARY


 Doris Penrod appeals from a take nothing judgment entered in favor of David R. Schecter,
M.D., Individually, and d/b/a Schecter and Blumenfeld, P.A., following a jury trial on her medical
malpractice claim. 

The Events at Dr. Schecter's Office


 On August 6, 2003, Jessica Penrod took her grandmother, Doris Penrod, to a surgical center
for cataract surgery. Penrod was scheduled to undergo cataract surgery on her left eye with
Dr. Schecter. At approximately 11:30 a.m., Cesar Berdeja, M.D., an anesthesiologist, administered
a retrobulbar injection of anesthesia. The injection caused a small retrobulbar hemorrhage (RBH)
about the size of a dime in the superior portion of Penrod's eye. RBH is a rare complication,
occurring in less than 2 percent of patients who receive a retrobulbar injection, and of this subset,
about .025 percent suffers damage to the optic nerve. (1) RBH can cause pressure to build up behind
the eye which the body relieves by allowing the eye to move forward against the eyelid. The optic
nerve has some elasticity which enables the eye to push out to relieve pressure. In that instance, a
rise in the intraocular pressure will not occur. The bleeding often stops due to clotting or from the
increasing pressure which tamponades the bleeding. If the RBH continues to bleed, the pressure can
increase to the point that the patient is at risk for injury to the optic nerve.

 Dr. Berdeja observed the RBH for fifteen to twenty minutes. The size of it did not change
during this period of observation. Dr. Berdeja took Penrod into the operating room and Dr. Schecter
examined the RBH under a microscope for three to five minutes. The RBH did not change and had
tamponaded. Dr. Schecter did not observe any swelling of the eyelids, redness in the eye,
ecchymosis (2), discoloration of the eye, or proptosis. (3) He specifically examined Penrod's eyelids to
determine if there was room for the eye to push out and relieve the pressure. Dr. Schecter observed
that the eyelids were not taut. Based on his clinical evaluation, he did not believe there was a need
to use the tonometer to assess intraocular pressure. Nevertheless, Dr. Schecter canceled the cataract
surgery due to the risk of complications. A shield and eyepatch were placed over the eye and Penrod
was discharged at approximately 2 p.m. with instructions to apply an ice pack to the eye for two to
three hours and to call Dr. Schecter if she had any problems. She was also instructed to return to
Dr. Schecter's office the following morning. 

Penrod Leaves Dr. Schecter's Office


 Jessica drove Penrod to a podiatrist's office where Jessica's mother, Lily Penrod, worked. 
The trip from the surgical center to Lily's place of employment took twenty to twenty-five minutes. 
When they arrived, Jessica could see redness around the eyepatch which had not been there when
they were at Dr. Schecter's office. Lily removed the eyepatch and shield and saw a large hemorrhage
around the eye. Lily's employer looked at the eye and recommended that she take Penrod to a
hospital. Lily instead decided that Jessica should drive Penrod home. Afterward, Penrod began
complaining of severe pain. Jessica claimed that she called Dr. Schecter that afternoon to report that
Penrod was experiencing extreme pain and asked whether she should take Penrod to the hospital. 
Dr. Schecter purportedly told Jessica not to go to the hospital and instructed her to return Penrod to
his office the following morning. He also told Jessica to give Penrod some Tylenol 3. Dr. Schecter
denied speaking with Jessica that afternoon and denied prescribing Tylenol 3. He would not have
advised Jessica against taking her grandmother to the hospital. 

The Second Visit and the Aftermath


 Penrod, accompanied by Jessica, returned to Dr. Schecter's office the following morning. 
There was substantial bruising around the eye and Penrod had no vision--only light perception. She
could not identify two fingers held up in front of her. Dr. Schecter concluded that Penrod had
suffered a rebleed after she left his office the previous day. He prescribed Lumigan drops and
Neptazine, which are used to lower intraocular pressure. Jessica took Penrod home but she
continued to suffer from significant eye pain. Jessica called Dr. Schecter around 1 p.m. that
afternoon and he advised her to take Penrod to the hospital and to tell the emergency room staff to
call him. Penrod did not present at the ER until 6 p.m. that evening and the ER staff did not call
Dr. Schecter until approximately 2:30 a.m. He went directly to the ER and examined the eye. The
proptosis appeared the same and Dr. Schecter concluded that Penrod's eye pain was due to swelling
of the conjunctiva and stretching of nerve endings. He discussed performing a lateral canthotomy (4)
but did not believe it was necessary. 

 Penrod returned to Dr. Schecter's office a week later. The vision in the left eye had not
improved. Dr. Schecter measured the intraocular pressure using the tonometer and determined that
it was normal. When Penrod's vision did not improve after three weeks, Dr. Schecter sent her to a
specialist, Dr. Roy Levit, to determine whether she had optic nerve or retinal damage. Dr. Levit
found that Penrod did not have macular or retinal changes but she had severe ischemic optic atrophy. 
RBH is one possible cause of ischemic optic atrophy, but Dr. Levit opined it could also be caused
by toxicity resulting from the injection, or blockage in a blood vessel from the injection. 

The Experts


 At trial, Penrod offered the testimony of Oliver Schein, M.D., a professor of ophthalmology
at the Wilmer Eye Institute at Johns Hopkins University. Dr. Schein spends about one-half of his
time in direct patient care with most of the remainder of his time devoted to clinical research. His
expertise is in the anterior segment of the eye and he primarily specializes in cataract, cataract
surgery, and complications of cataract surgery. Dr. Schein explained to the jury the structures of the
eye and the function of those structures, including the optic nerve. The optic nerve requires oxygen
to survive. Consequently, if the blood supply to the optic nerve and its coating is diminished from
compression for a long enough period of time, then the nerve will cease to function and will result
in loss of vision. When a retrobulbar injection is made, the needle is inserted between the bone and
the eye into the space behind the eye. It is possible that the needle could encounter and lacerate a
blood vessel. Because the space behind the eye is enclosed, it fills up with blood within seconds and
there is no place for the blood to escape. As a result, it seeps forward and can be seen in the upper
and lower eyelids and in the white part of the eye. The bleeding often stops because the pressure
tamponades the lacerated vessel, but pressure is also placed on the eye itself. 

 Dr. Schein viewed a photograph of Penrod taken by her grandmother on August 6, 2003, the
day of surgery. The upper and lower lids are dark with blood and the eye is swollen and protruding
from pressure. In Dr. Schein's expert opinion, the standard of care required Dr. Schecter to measure
intraocular eye pressure through the use of a tonometer. If the pressure is substantially elevated, the
appropriate intervention would be to perform a procedure known as a lateral canthotomy which
involves cutting a tendon in the eyelid to create an opening for the blood to move forward and reduce
pressure on the eye. If that failed to reduce the pressure, a small opening could be made in the eye
to remove some of the aqueous. Dr. Schein acknowledged that there are medicines which can bring
the pressure down but they take thirty to sixty minutes to work. Dr. Schein believed that
Dr. Schecter's method of detecting elevated eye pressure--moving the eyelid to determine mobility--
was not an assessment at all because the pressure could be elevated even where the eyelid is mobile. 
On cross-examination, he admitted that clinical observation of eyelid elasticity is part of an
assessment, but he maintained that mere observation is inadequate and Dr. Schecter should have
used a tonometer. In his opinion, Dr. Schecter did not do enough to determine whether a lateral
canthotomy should have been performed. 

 Dr. Schein also testified that there could be compression of the optic nerve even in the
presence of a normal eye pressure reading. Thus, the standard of care also required Dr. Schecter to
evaluate Penrod's vision and the response of her pupils to light four to six hours after surgery. Due
to the anesthesia injection, it is impossible to measure vision until the anesthesia wears off. 
According to Dr. Schein, damage to the optic nerve from compression could occur in an hour or two,
or occur over a longer period of time. He could not state whether the damage to Penrod's optic nerve
occurred two hours after the RBH or twenty-four hours later. Dr. Schecter did not examine her
vision until the following day approximately twenty-four hours after the retrobulbar injection. If her
vision was poor at this time, a physician should be concerned about compression of the optic nerve. 
In such a case, a CAT scan of the eye would be the next step. Finally, a physician should perform
surgery to evacuate the blood accumulated behind the eye. All of these procedures should be done
within twenty-four hours of the retrobulbar injection. In Dr. Schein's opinion, Penrod's loss of
vision could have occurred through two mechanisms: increased intraocular pressure or compression
of the optic nerve from blood accumulated in the back of the eye. Further, he opined that it was
reasonably foreseeable that Dr. Schecter's failure to measure the intraocular pressure and evaluate
her vision led to damage of the optic nerve and loss of vision. Dr. Schein acknowledged that damage
to the optic nerve following RBH could occur without negligence. 

 Dr. Schecter offered the expert testimony of Bernard A. Milstein, M.D., the Clinical
Professor of Ophthalmology at the University of Texas Medical Branch in Galveston. Dr. Milstein
devotes approximately 95 percent of his time to patient care, and in the last fifteen to twenty years,
his practice has centered around cataract surgery and intraocular lens implantation using Verisyse
Phakic and Lasik surgery. Dr. Milstein averages 400 to 500 cases of cataract surgery per year and
he has extensive experience with retrobulbar injections. Dr. Milstein explained for the jury how a
retrobulbar injection is performed and he described the potential complications which could occur. 
In addition to an RBH, the optic nerve can be damaged by the injection itself or the anesthetic can
cause a toxic injury. He could not determine which of these events caused Penrod's optic nerve
atrophy. In his opinion, if Dr. Berdeja injected the optic nerve or if the anesthetic caused a toxic
injury, Dr. Schecter could not have taken any action which would have prevented damage to the
optic nerve. It has been postulated that if there is pressure behind the eye from the blood pushing
the globe forward, the pressure of the eye against the lids can cause pressure inside the eye . Dr.
Milstein agreed with Dr. Schecter that an ophthalmologist can assess whether there is too much
pressure behind the eye by feeling the tensile pressure on the lids. If the lids are taut, a lateral
canthotomy can be performed to reduce or relieve the pressure on the lids and allow the globe to
move forward. If there is no pressure on the lids from the eye, then there is no reason to use a
tonometer or to perform the lateral canthotomy. Based on his review of the records and the evidence
presented to him, Dr. Milstein concluded that a reasonably prudent ophthalmic surgeon would not
have used a tonometer on the day of surgery given the absence of tautness in the eyelids. Dr.
Milstein also found that a reasonably prudent ophthalmologist would have released Penrod with
instructions to call if a problem arose and to return to the office the following day. 

The Charge Conference


 During the charge conference, Dr. Schecter's counsel objected to the court's failure to include
an instruction on "new and unexpected cause." (5) The court denied that request. Immediately after
that ruling, Penrod's counsel pointed out that the proximate cause definition included in the charge
had the "unbroken by any new and independent cause" language in it. The court cut counsel off,
stating that Dr. Schecter's counsel had requested an instruction on unavoidable accident and said,
"Let's just not waste time." The court's charge included the following definition:

 'PROXIMATE CAUSE', when used with respect to the conduct of DAVID R.
SCHECTER, M.D., means that cause which, in a natural and continuous sequence,
unbroken by any new and independent cause, produces an event, and without which
cause such event would not have occurred. In order to be a proximate cause, the act
or omission complained of must be such that an ophthalmic surgeon exercising
ordinary care would have foreseen that the event, or some similar event, might
reasonably result therefrom. There may be more than one proximate cause of an
event. [Emphasis added].


The jury found that the negligence, if any, of Dr. Schecter did not proximately cause the occurrence
in question. Penrod filed a motion for new trial complaining that the inclusion of the "new and
independent cause" language in the proximate cause instruction was erroneous. At the hearing on
the motion for new trial, the trial judge admitted that it was not his intention to leave that language
in the definition since he had denied Dr. Schecter's request for an instruction on "new and
independent cause." He had noticed the error when he was reading the charge to the jury. The court
also observed that Penrod's counsel had attempted to bring the error to his attention but he was
focused on something else at the time. 

 Trial court: And for the record, it was the Court's mistake to leave that wording in
under proximate cause because I had found not to instruct them on new and
independent cause. You did point it out to me; however, I think I was looking at
something else at the time and, frankly, as I was reading the charge, I realized that
that shouldn't have been in there in proximate cause. And then I know Mr. Hicks
argued that.


 So, for the record, the Court did make a mistake in leaving that in the definition of
proximate cause. Whether that's harmful error or no error at all, we'll see. 


* * * * *



 Trial court: And frankly, my mind was some place else, but he's telling me, "If you
leave it in there," quote, "unbroken by any new and independent cause," because you
assumed that you were going to get the inferential rebuttal.


 So, I've got my mistake and then rightfully so, rightfully so, I don't think you did
anything wrong in arguing it because it's there. I gave it to you. So I don't know if
that compounds or magnifies my error. 


* * * * *



 Trial court: And, for the record, whoever reads this record upstairs, I never intended
for that to go in. I made a mistake. Now, whether that's harmful or harmless is for
somebody else to decide. 


Ultimately, the trial court denied the motion for new trial and this appeal follows. 

PROXIMATE CAUSE INSTRUCTION


 In two related issues for review, Penrod contends that the take nothing judgment should be
reversed because of the erroneous inclusion of the "new and independence cause" language in the
definition of proximate cause. Dr. Schecter responds that the definition did not misstate the law. 
Alternatively, he argues that the error is harmless.

Preservation of Error


 Dr. Schecter did not raise preservation of error in his brief, but he asserted at oral argument
that Penrod has waived her complaint about the proximate cause instruction. Rule 274 of the Texas
Rules of Civil Procedure provides:

 A party objecting to a charge must point out distinctly the objectionable matter and
the grounds of the objection. Any complaint as to a question, definition, or
instruction, on account of any defect, omission, or fault in pleading, is waived unless
specifically included in the objections. When the complaining party's objection, or
requested question, definition, or instruction is, in the opinion of the appellate court,
obscured or concealed by voluminous unfounded objections, minute differentiations
or numerous unnecessary requests, such objection or request shall be untenable. No
objection to one part of the charge may be adopted and applied to any other part of
the charge by reference only. 


Tex.R.Civ.P. 274. Under Rule 272, the trial court is required to rule on objections to the charge
before reading the charge to the jury. See Tex.R.Civ.P. 272. This rule also imposes a presumption
that "the party making such objections presented the same at the proper time and excepted to the
ruling thereon." Id. The Texas Supreme Court has held that Rule 272's presumptive provision
means that if an objection is articulated and the trial court makes no change in the charge, the
objection is, of necessity, overruled. Acord v. General Motors Corp., 669 S.W.2d 111, 114 (Tex.
1984). Rule 33.1(a)(2)(A) of the Texas Rules of Appellate Procedure is consistent with the Acord
decision because it permits error to be preserved by either an express or implicit ruling on an
objection. See Tex.R.App.P. 33.1(a)(2)(A).

 It is undisputed that Penrod's attorney specifically objected to the inclusion of the "unbroken
by any new and independent cause" language in the proximate cause instruction. The trial court cut 
counsel off stating, "She requested one on unavoidable accident. Let's just not waste time." The
court then instructed defense counsel to proceed. Because the definition of proximate cause included
the language objected to by Penrod, we conclude that the court impliedly overruled the objection. 
Therefore, Penrod preserved error under Acord and Rule 33.1(a)(2)(A).


Standard of Review


 Rule 278 requires the trial court to "submit the questions, instructions and definitions in the
form provided by Rule 277, which are raised by the written pleadings and the evidence." 
Tex.R.Civ.P. 278. We review an allegation of jury charge error for an abuse of discretion. Texas
Department of Human Services. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990); Alfiji, S.A. de C.V. v.
Woodal, 280 S.W.3d 897, 899-900 (Tex.App.--El Paso 2009, no pet.). A trial court abuses its
discretion by acting arbitrarily, unreasonably, or without consideration of guiding principles. Walker
v. Gutierrez, 111 S.W.3d 56, 62 (Tex. 2003). 

New and Independent Cause


 New and independent cause is a component of the proximate cause issue. Columbia Rio
Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 856 (Tex. 2009), citing Dallas Railway &
Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379, 383-84 (Tex. 1952)("The theory of new and
independent cause is not an affirmative defense; it is but an element to be considered by the jury in
determining the existence or non-existence of proximate cause."). A new and independent cause of
an occurrence is the act or omission of a separate and independent agent, not reasonably foreseeable,
that destroys the causal connection, if any, between the act or omission inquired about and the
occurrence in question. Columbia Rio Grande Healthcare, L.P., 284 S.W.3d at 856.

 If the act or omission alleged to have been a new and independent cause is reasonably
foreseeable at the time of the defendant's alleged negligence, the new act or omission is a concurring
cause as opposed to a superseding or new and independent cause. Id. at 857; Dew v. Crown Derrick
Erectors, Inc., 208 S.W.3d 448, 451 (Tex. 2006). A new and independent cause alters the natural
sequence of events, produces results that would not otherwise have occurred, is an act or omission
not brought into operation by the original wrongful act of the defendant, and operates entirely
independently of the defendant's allegedly negligent act or omission. Columbia Rio Grande
Healthcare, L.P., 284 S.W.3d at 857.

Is the Definition Erroneous?


 An instruction is proper only if it (1) assists the jury, (2) accurately states the law, and
(3) finds support in the pleadings and evidence. Columbia Rio Grande Healthcare, L.P., 284 S.W.3d
at 855; El Paso Refining, Inc. v. Scurlock Permian Corporation, 77 S.W.3d 374, 388 (Tex.App.--El Paso 2002, pet. denied). The definition of proximate cause submitted to the jury fails on all
accounts. It does not assist the jury because it includes the phrase "unbroken by any new and
independent cause" without any explanatory provisions. Further, the definition does not accurately
state the definition of proximate cause applicable in this case. Finally, Dr. Schecter's answer raised
the issue of new and independent cause, but the evidence did not support its submission to the jury. 
We understand Dr. Schecter to posit that the new and independent cause is the rebleed which
occurred after Penrod left the surgical center. While there is some evidence in the record that the
RBH had tamponaded before Penrod left the surgical center and began to rebleed sometime after she
left, there is no evidence of what act or omission caused the rebleed. Thus, there is no evidence that
the act or omission which caused the rebleed was not brought into operation by the original wrongful
act of the defendant. There is no evidence that the rebleed altered the natural sequence of events, 
produced results that would not otherwise have occurred, or that it operated entirely independently
of the defendant's allegedly negligent act or omission. We therefore conclude that the definition of
proximate cause is erroneous because it included the "unbroken by new and independent cause"
language.

Is the Erroneous Definition Harmful?


 We turn now to a harm analysis. A judgment will not be reversed for charge error unless the
error was harmful because it probably caused the rendition of an improper verdict or probably
prevented the petitioner from properly presenting the case to the appellate courts. Tex.R.App. P.
44.1; Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 723 (Tex. 2003); Alfiji, S.A. de C.V., 280
S.W.3d at 900. Charge error is generally considered harmful if it relates to a contested, critical issue. 
Columbia Rio Grande Healthcare, L.P., 284 S.W.3d at 856.

 The record reflects that causation was a contested, critical issue at trial. Penrod's expert,
Dr. Schein, testified that the standard of care required an ophthalmologist to evaluate the patient's
eye pressure and vision following the RBH and for several hours afterward to ensure that the optic
nerve had not been damaged. In Dr. Schein's expert opinion, it was likely that Penrod's eye pressure
was high as a result of the RBH, such that Dr. Schecter's failure to measure intraocular pressure
resulted in a failure to treat elevated pressure which in turn resulted in optic nerve damage and loss
of vision. Dr. Schecter, on the other hand, testified that the standard of care did not require him to
continue to evaluate Penrod on the day of the scheduled surgery. Dr. Milstein agreed that a
reasonably prudent ophthalmologist would have released Penrod with instructions to call if a
problem arose and to return to the office the following day. Both Drs. Schecter and Milstein
believed that Penrod experienced a rebleed after she left the surgical center. 

 Penrod maintains that the erroneous definition of proximate cause probably caused the
rendition of an improper judgment because it permitted Dr. Schecter to advocate a defensive theory
otherwise unavailable to him. In support of her contention, Penrod points to the following portion
of defense counsel's final argument:

 Proximate cause says, 'That cause which in a continuous sequence unbroken by any
new or independent cause produces an event.' Unbroken by any new or independent
cause. There was a new independent cause. A new independent cause is whatever
caused it to rebleed. That is what broke. Even if you think Dr. Schecter should have
used the tonometer, after she left his care, after the nurses from the surgical center
saw her, after he saw her, something happened that she had a rebleed. That's a new
and independent cause that occurred. If you get to Question Number One, it says: 
Did the negligence of David R. Schecter, M.D. proximately cause the occurrence in
question? My suggestion is that the answer to that is no. If you answer no, then
you're done. 


Defense counsel seized upon the inadvertent but erroneous language in the jury charge to argue that
"whatever" caused the re-bleed after Penrod left the surgical center was a new and independent
cause, and therefore, the jury should find that Dr. Schecter's negligence, if any, did not proximately
cause the occurrence in question. (6) This argument could not have been made absent the defective
proximate cause instruction. The argument is significant because it provided a defense to Penrod's
claim that Dr. Schecter failed to monitor the RBH complication. While defense counsel argued,
based on the evidence, that the standard of care did not require Dr. Schecter to continue to monitor
Penrod's condition on the day of surgery, the defective proximate cause definition permitted counsel
to sidestep Dr. Schein's expert opinion that Dr. Schecter should have continued to monitor the
complication. Instead, he was able to argue that there was a new and independent cause for the
rebleed, albeit that the "whatever caused it to rebleed" was never identified.

 Dr. Schecter contends that the error is harmless because the jury could have rejected Dr.
Schein's testimony given the testimony about alternative causes for Appellant's loss of vision that
were unrelated to Dr. Schecter's conduct. He cites James v. Kloos, 75 S.W.3d 153 (Tex.App.--Fort
Worth 2002, no pet.) in support of his argument. There, the trial court granted the defendant's
request for an instruction on new and independent cause. The court of appeals determined that the
instruction should not have been given because the defendant failed to present any evidence of an
act or omission of a separate and independent agency that destroyed the causal connection between
the defendant's allegedly negligent act and the plaintiff's injury. Id. at 163. Thus, the defendant did
not offer evidence that the plaintiff's injury was not a reasonably foreseeable result or natural
consequence of the incident in question. Id. at 162-63. The court determined, however, that the
instruction was not harmful because defense mentioned new and independent cause only twice in
sixteen pages of argument and it could not be determined that the improper instruction resulted in
an improper judgment. Id. at 163-64. 

 James is factually distinguishable. The trial court there intentionally submitted a properly
worded instruction on new and independent cause. As it turned out, the charge should not have been
given. Here, the trial court did not instruct the jury on new and independent cause but inadvertently
left the new and independent cause language in the definition of proximate cause. In the absence of
an instruction to guide the jury's consideration of new and independent cause, the jury was able to
disregard whether Penrod's injury was a natural consequence of Dr. Schecter's failure to monitor the
complication if it found, at defense counsel's urging, that something caused it to rebleed after she
left the surgical center.

CONCLUSION


 Under the unique facts presented, we conclude that the charge error probably caused the
rendition of an improper verdict. Accordingly, we sustain Issues One and Two and remand the cause
for a new trial.


November 12, 2009 

 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Rivera, JJ.
1. At the time of trial, Dr. Schecter had seen about twenty-five cases of RBH during his twenty-five year career.
2. A bruise or contusion is sometimes referred to by doctors as ecchymosis. It involves injury to tissues in which
the capillaries are damaged, allowing blood to seep into the surrounding tissue.
3. Proptosis is a bulging of the eye anteriorly out of the orbit.
4. A lateral canthotomy is a surgical division of the outer canthus to release the accumulated blood.
5. In his brief on appeal, Dr. Schecter maintains that he did not request an instruction on new and independent
cause but instead requested an unavoidable accident instruction. In his first amended answer, Dr. Schecter raised
numerous defensive matters, including both unavoidable accident and new and independent cause. Prior to trial, Dr.
Schecter filed his requested definitions and instructions which included an instruction on new and independent cause. 
The record before us reflects that Dr. Schecter indeed tendered a written instruction on unavoidable accident which the
trial court denied during trial. Counsel's objection to the absence of a "new and unexpected cause" instruction sounds
more like "new and independent cause" than "unavoidable accident," but the record does not include a written request
for a "new and independent cause" instruction.
6. We agree with the trial court's assessment that counsel did nothing wrong in arguing the issue because the
language was indeed included in the charge.