# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00570-CV

**Jeffrey Fennern and Farah Fennern,**
**Individually and on Behalf of the Estate of Shelly Fennern, Appellants**

**v.**

**William Whitehead, M.D., Appellee**

## FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 391ST JUDICIAL DISTRICT
### NO. D-08-0664-C, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is a medical negligence case. In 2007, Shelly Fennern ("Fennern") underwent colon resection surgery, had a second surgery 12 days later to repair a postoperative leak, and died at the hospital two weeks later. Appellants Jeffrey Fennern and Farah Fennern, individually and on behalf of the estate of Fennern,[1] filed suit against appellee William Whitehead, M.D, alleging that Fennern's death was a result of Whitehead's negligence. The district court granted Whitehead's motion to exclude the testimony of appellants' expert witness who testified on the issue of proximate cause, and consequently, the district court also granted Whitehead's no-evidence motion for summary judgment. Appellants appeal, asserting that the district court erred in granting the motion to exclude. We affirm.

---

[1] Jeffrey Fennern is the surviving husband, and Farah Fennern is a surviving daughter.

*Factual and Procedural Background*

Fennern, a 47-year-old woman, underwent elective colon resection surgery on March 28, 2007, at Shannon Medical Center in San Angelo. On April 9, 2007, a CT scan performed on Fennern indicated an anastomotic leak from the operation, and Fennern underwent additional surgery to correct the leak.

Following the April 9 surgery, Fennern began having increasing tachycardia (rapid heart rate) and hypoxemia (low blood oxygen) and was complaining of shortness of breath. After several days of receiving treatment for those conditions, Fennern improved, was removed from her ventilator on April 20, and was transferred out of the hospital's intensive care unit on April 22. However, in the early morning of April 23, Fennern "became unresponsive." Although she was initially revived, she died the morning of April 23, 2007, after being removed from the vasopressor agents at the request of her family.

On May 19, 2008, appellants filed suit against Whitehead—Fennern's treating physician—alleging medical negligence and making claims pursuant to the wrongful death and survival statutes. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002, .021 (West 2008). Appellants do not complain of the leak's occurrence following the initial surgery or the treatment provided once the leak was diagnosed. Appellants' allegation is that Whitehead should have diagnosed the anastomotic leak as early as April 5, and that his failure to diagnose the leak until April 9 was a breach of the applicable standard of care and a proximate cause of Fennern's death.

Appellants relied on the expert testimony of Dr. Brian Camazine on the issue of proximate cause. Whitehead filed a motion to exclude Dr. Camazine's testimony on proximate

2

cause as well as a no-evidence motion for summary judgment on that element of appellants' claims. On August 28, 2009, the district court granted both motions and entered a take-nothing judgment against appellants.

*Analysis*

Having alleged medical negligence, appellants were required to show by a preponderance of the evidence that, to a reasonable medical probability, the allegedly negligent act or omission was a proximate cause of the harm alleged. *See Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995). To constitute proximate cause, the defendant's acts or omissions must have been a "substantial factor" in bringing about the injury. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009). The plaintiffs must demonstrate a causal connection between the injuries and the negligence of the defendant based on reasonable medical probability, not mere conjecture, speculation, or possibility. *Arlington Mem'l Hosp. Found., Inc. v. Baird*, 991 S.W.2d 918, 922 (Tex. App.—Fort Worth 1999, pet. denied).

Appellants contend that the district court erred in excluding Dr. Camazine's testimony on proximate cause. In his motion to exclude Dr. Camazine's expert testimony, Whitehead argued that Dr. Camazine's testimony was not based on a reliable foundation. The proponent of expert testimony has the burden to show that the scientific technique or principle underlying the testimony is reliable. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). Scientific evidence that is not grounded in the methods and procedures of science is no more than subjective belief or unsupported speculation and, therefore, is not reliable and not admissible. *See id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)).

3

Factors that a trial court may consider when determining the reliability of expert testimony involving scientific knowledge include (1) the extent to which the theory has been or can be tested, (2) the extent to which the technique relies upon the expert's subjective interpretation, (3) whether the theory has been subjected to peer review or publication, (4) the technique's potential rate of error, (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community, and (6) the non-judicial uses that have been made of the theory or technique. *Id.* These factors may not apply when testimony relies on the expert's own technical or other specialized knowledge. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). Even then, however, there must be some basis for the opinion to show its reliability. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). An expert's bare opinion will not suffice, and there cannot be too great an analytical gap between the data and the opinion proffered. *Id.*

To connect Fennern's death with the four-day delay in Whitehead's diagnosing her anastomotic leak, Dr. Camazine made the following assertions: (1) the additional spillage from the leak during the four-day period preceding the April 9 surgery caused a condition called peritonitis, which in turn led to sepsis, and those conditions, either individually or in tandem, led to acute respiratory distress syndrome (ARDS); (2) Fennern's death was due to either pulmonary embolus or cardiac arrhythmia; and (3) neither pulmonary embolus nor cardiac arrhythmia would have occurred but for the conditions of peritonitis, sepsis, and ARDS that developed as well as the treatment that was necessitated due to those conditions.

In his original report made on April 10, 2008, and attached to appellants' pleadings, Dr. Camazine stated that he was "aware that delayed diagnosis often leads to death," and based his opinions on his "education, training and experience," as well as "from a broad reading and general knowledge of medical literature and information related to these conditions and medical issues." In his deposition on April 28, 2009, Dr. Camazine further testified as follows:

> I have seen dozens and dozens, maybe hundreds of cases of sepsis like this. If you let them go, the patient dies. If you catch them earlier, they survive. . . . You wouldn't expect anybody to survive if they were operated on postoperative day 12. It's a rare event. Even a young person can be taken out if their sepsis has been going on until postoperative day 12.

However, Dr. Camazine also acknowledged that he had performed no medical literature review to determine whether there was published documentation to support his opinions.

On July 8, 2009, Dr. Camazine supplemented his prior report with an affidavit to which he attached two articles on anastomotic leakage, each of which states that early intervention improves the patient's outcome. Neither article, however, lends support for Dr. Camazine's testimony regarding the significance of the delay in Fennern's diagnosis—specifically, from day 8 following her initial surgery to day 12.

According to the first article, of 655 patients who underwent colonic or rectal resection in the article's study group, 39 experienced leakage. No deaths occurred among the 11 patients reoperated on before day 5, but 5 of the 23 patients reoperated on after day 5 died. The mean postoperative period for diagnosis was 8.1 plus or minus 4 days, and the applicable range was 4 to 25 days. The second article described a separate study in which there were 36 patients identified

5

with a postoperative lower gastrointestinal leak. In that study, the majority of patients were reoperated on at day 10 after their primary operation, with an average of 10.1 days, and a range of 2 to 50 days. The study group had 3 deaths, but the article did not provide any information regarding when the reoperations occurred for those who died. Thus, neither article provides any evidence regarding the specific significance of the 8- to 12-day range, and in fact, Fennern was reoperated on within both studies' range and well below the maximums of 25 and 50 days. Moreover, appellants do not allege that Fennern should have been diagnosed by day 5, which is the cut-off, according to the first article, for a mortality rate of zero.[2]

Therefore, while there is evidence that Fennern developed peritonitis, sepsis, and ARDS, and while Dr. Camazine avers that there was no evidence of "significant" peritonitis or sepsis as of April 5, Dr. Camazine has not shown sufficient basis for his opinion that Fennern's death was caused by a four-day delay in diagnosis. The medical literature provided by Dr. Camazine is not consistent with his testimony that survival is rare for reoperation occurring on day 12 following the initial surgery, and gives no support for his opinion that a delay from day 8 to day 12 was a substantial factor in bringing about the conditions that caused Fennern's death. Moreover, Dr. Camazine did not set forth how his training or experience informed his conclusions regarding the relationship between a 4-day delay and Fennern's death beyond his general observation that "the

---

[2] Neither article sets out the specific numbers of postoperative days when each of the patients was diagnosed. We note, however, that the first study's selection of day 5 as the cut-off for the mortality statistics leads to a reasonable inference that one of the patients in the study who died had a reoperation on day 6.

6

longer you leave someone with an anastomotic leak, the less their chances of survival." Appellants have not shown a reliable basis for Dr. Camazine's ultimate opinion as to Fennern's cause of death.

In addition, the district court could have reasonably concluded that Dr. Camazine did not sufficiently demonstrate a causal connection between the conditions of peritonitis, sepsis, and ARDS and the pulmonary embolus or cardiac arrhythmia that allegedly caused Fennern's death. *See Gammill*, 972 S.W.2d at 727-28 (affirming exclusion of expert testimony due to "analytical gap" between data and opinion proffered). Regarding pulmonary embolus, which Dr. Camazine testified was the probable cause of Fennern's death, Dr. Camazine averred the following:

> [I]t is recognized in science and literature that one of the main risks of pulmonary embolus is a long period of bed rest. In this case, had Mrs. Fennern not suffered her lengthy illness, she would have been discharged in a prompt fashion and would have been at home for a lengthy period of time engaged in the activities of daily living. She would not have developed thrombus in the deep veins of her pelvis that eventually break off and move to the pulmonary system to result in cardiovascular collapse had she not been hospitalized for a lengthy period of time. In this connection, I would note that Dr. Whitehead considered pulmonary embolus at the time of the event and treated it with TPA. This is a medication designed to dissolve clots like a pulmonary system. Thus, the patient could have sustained a pulmonary embolus that caused a cardiovascular arrest for long enough to sustain brain damage but the evidence for pulmonary embolus was dissolved by the TPA and therefore not found at autopsy.

Dr. Camazine provided no support other than his bare opinion that Whitehead's treatment of Fennern resulted in pulmonary embolus, which then caused her death. Specifically, he relies on the assertion that bed rest is "one of the main risks" of pulmonary embolus, the fact that Whitehead "considered" the possibility of pulmonary embolus in his treatment of Fennern, and the argument that the absence

7

of evidence at the autopsy did not impact the possibility that Fennern "could have" sustained a pulmonary embolus that resulted in her death.

Regarding a cardiac arrhythmia, which Dr. Camazine testified was the other possible cause of Fennern's death, Dr. Camazine averred the following:

> There are . . . several risk factors for cardiac arrhythmia that were created by Dr. Whitehead's negligence. One is weight gain. . . .
>
> Second, the patient had a persistent tachycardia or elevated heart rate probably due to the whole body swelling and the ongoing infection in the patient's body. At the time of her death, her white blood cell count had come down from its peak levels but was still elevated in a range that is significant for ongoing infection. This ongoing infection was probably part of the cause for the patient's tachycardia. This tachycardia put the patient at an increased risk of cardiac arrhythmia. Further, the evidence shows that the patient's potassium was elevated at around the time of arrest at 5.5 . . . . In this connection, the patient's lengthy infection, peritonitis, and sepsis probably led to anemia and low blood pressure (lab work does show the patient is anemic prior to death), which in turn compromised blood flow to the kidneys leading to acute tubular necrosis which in turn inhibited the kidneys' ability to get potassium out of the system which in turn led to an elevated potassium level which puts a patient at risk of cardiac arrhythmia and asystole. Each of the steps I have just described is basic information taught in medical school.

Dr. Camazine provided no support for his opinions regarding Whitehead's negligence causing Fennern to suffer cardiac arrhythmia other than the existence of conditions—which, he alleges, were "probably" caused by Whitehead's negligence—that are "risk factors" for cardiac arrhythmia.

Even taking as true that the only possible causes for Fennern's death are pulmonary embolus and cardiac arrhythmia,[3] Dr. Camazine has only averred that Whitehead's alleged negligence probably increased Fennern's risk of developing either of the conditions that he thinks

---

[3] Fennern's autopsy did not result in a conclusive identification of her cause of death.

may have caused Fennern's death. To constitute proximate cause, Whitehead's acts or omissions must have been a "substantial factor" in bringing about Fennern's death. *See Columbia Rio Grande Healthcare*, 284 S.W.3d at 860. The alleged causal connection must be based on "reasonable medical probability," not mere conjecture, speculation, or possibility. *See Arlington Mem'l Hosp. Found.*, 991 S.W.2d at 922. Therefore, we conclude it was not error for the district court to have determined that Dr. Camazine's opinion—that a four-day delay in diagnosis was the proximate cause of Fennern's death—was speculative and contains an analytical gap, causing his opinion to be unreliable. *See Wiggs v. All Saints Health Sys.*, 124 S.W.3d 407, 412-14 (Tex. App.—Fort Worth 2003, pet. denied).

The district court did not err by excluding Dr. Camazine's testimony as unreliable. We affirm the judgment of the district court.[4]

_____

G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed: June 18, 2010

_____

[4] Appellants do not contend that, with Dr. Camazine's testimony excluded, it was error to grant Whitehead's motion for summary judgment.