TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00570-CV






Jeffrey Fennern and Farah Fennern,

Individually and on Behalf of the Estate of Shelly Fennern, Appellants


v.


William Whitehead, M.D., Appellee






FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 391ST JUDICIAL DISTRICT

NO. D-08-0664-C, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 This is a medical negligence case. In 2007, Shelly Fennern ("Fennern") underwent
colon resection surgery, had a second surgery 12 days later to repair a postoperative leak, and died
at the hospital two weeks later. Appellants Jeffrey Fennern and Farah Fennern, individually and on
behalf of the estate of Fennern, (1) filed suit against appellee William Whitehead, M.D, alleging that
Fennern's death was a result of Whitehead's negligence. The district court granted Whitehead's
motion to exclude the testimony of appellants' expert witness who testified on the issue of proximate
cause, and consequently, the district court also granted Whitehead's no-evidence motion for
summary judgment. Appellants appeal, asserting that the district court erred in granting the motion
to exclude. We affirm.

Factual and Procedural Background

 Fennern, a 47-year-old woman, underwent elective colon resection surgery on
March 28, 2007, at Shannon Medical Center in San Angelo. On April 9, 2007, a CT scan performed
on Fennern indicated an anastomotic leak from the operation, and Fennern underwent additional
surgery to correct the leak.

 Following the April 9 surgery, Fennern began having increasing tachycardia (rapid
heart rate) and hypoxemia (low blood oxygen) and was complaining of shortness of breath. After
several days of receiving treatment for those conditions, Fennern improved, was removed from her
ventilator on April 20, and was transferred out of the hospital's intensive care unit on April 22.
However, in the early morning of April 23, Fennern "became unresponsive." Although she was
initially revived, she died the morning of April 23, 2007, after being removed from the vasopressor
agents at the request of her family.

 On May 19, 2008, appellants filed suit against Whitehead--Fennern's treating
physician--alleging medical negligence and making claims pursuant to the wrongful death and
survival statutes. See Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002, .021 (West 2008). Appellants
do not complain of the leak's occurrence following the initial surgery or the treatment provided
once the leak was diagnosed. Appellants' allegation is that Whitehead should have diagnosed the
anastomotic leak as early as April 5, and that his failure to diagnose the leak until April 9 was a
breach of the applicable standard of care and a proximate cause of Fennern's death.

 Appellants relied on the expert testimony of Dr. Brian Camazine on the issue of
proximate cause. Whitehead filed a motion to exclude Dr. Camazine's testimony on proximate
cause as well as a no-evidence motion for summary judgment on that element of appellants' claims. 
On August 28, 2009, the district court granted both motions and entered a take-nothing judgment
against appellants.

Analysis

 Having alleged medical negligence, appellants were required to show by a
preponderance of the evidence that, to a reasonable medical probability, the allegedly negligent act
or omission was a proximate cause of the harm alleged. See Park Place Hosp. v. Estate of Milo,
909 S.W.2d 508, 511 (Tex. 1995). To constitute proximate cause, the defendant's acts or omissions
must have been a "substantial factor" in bringing about the injury. See Columbia Rio Grande
Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 860 (Tex. 2009). The plaintiffs must demonstrate a
causal connection between the injuries and the negligence of the defendant based on reasonable
medical probability, not mere conjecture, speculation, or possibility. Arlington Mem'l Hosp. Found.,
Inc. v. Baird, 991 S.W.2d 918, 922 (Tex. App.--Fort Worth 1999, pet. denied).

 Appellants contend that the district court erred in excluding Dr. Camazine's testimony
on proximate cause. In his motion to exclude Dr. Camazine's expert testimony, Whitehead
argued that Dr. Camazine's testimony was not based on a reliable foundation. The proponent of
expert testimony has the burden to show that the scientific technique or principle underlying
the testimony is reliable. See E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 557
(Tex. 1995). Scientific evidence that is not grounded in the methods and procedures of science is
no more than subjective belief or unsupported speculation and, therefore, is not reliable and not
admissible. See id. (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 (1993)). 
Factors that a trial court may consider when determining the reliability of expert testimony involving
scientific knowledge include (1) the extent to which the theory has been or can be tested, (2) the
extent to which the technique relies upon the expert's subjective interpretation, (3) whether the
theory has been subjected to peer review or publication, (4) the technique's potential rate of error,
(5) whether the underlying theory or technique has been generally accepted as valid by the relevant
scientific community, and (6) the non-judicial uses that have been made of the theory or technique.
Id. These factors may not apply when testimony relies on the expert's own technical or other
specialized knowledge. See Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726
(Tex. 1998). Even then, however, there must be some basis for the opinion to show its reliability. 
Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 578 (Tex. 2006). An expert's bare opinion will not
suffice, and there cannot be too great an analytical gap between the data and the opinion proffered.
Id.

 To connect Fennern's death with the four-day delay in Whitehead's diagnosing
her anastomotic leak, Dr. Camazine made the following assertions: (1) the additional spillage from
the leak during the four-day period preceding the April 9 surgery caused a condition called
peritonitis, which in turn led to sepsis, and those conditions, either individually or in tandem, led
to acute respiratory distress syndrome (ARDS); (2) Fennern's death was due to either pulmonary
embolus or cardiac arrhythmia; and (3) neither pulmonary embolus nor cardiac arrhythmia would
have occurred but for the conditions of peritonitis, sepsis, and ARDS that developed as well as the
treatment that was necessitated due to those conditions.

 In his original report made on April 10, 2008, and attached to appellants' pleadings,
Dr. Camazine stated that he was "aware that delayed diagnosis often leads to death," and based his
opinions on his "education, training and experience," as well as "from a broad reading and general
knowledge of medical literature and information related to these conditions and medical issues." 
In his deposition on April 28, 2009, Dr. Camazine further testified as follows:

I have seen dozens and dozens, maybe hundreds of cases of sepsis like this. If you let
them go, the patient dies. If you catch them earlier, they survive. . . . You wouldn't
expect anybody to survive if they were operated on postoperative day 12. It's a rare
event. Even a young person can be taken out if their sepsis has been going on until
postoperative day 12.

However, Dr. Camazine also acknowledged that he had performed no medical literature review to
determine whether there was published documentation to support his opinions.

 On July 8, 2009, Dr. Camazine supplemented his prior report with an affidavit to
which he attached two articles on anastomotic leakage, each of which states that early intervention
improves the patient's outcome. Neither article, however, lends support for Dr. Camazine's
testimony regarding the significance of the delay in Fennern's diagnosis--specifically, from day 8
following her initial surgery to day 12.

 According to the first article, of 655 patients who underwent colonic or rectal
resection in the article's study group, 39 experienced leakage. No deaths occurred among the
11 patients reoperated on before day 5, but 5 of the 23 patients reoperated on after day 5 died. The
mean postoperative period for diagnosis was 8.1 plus or minus 4 days, and the applicable range was
4 to 25 days. The second article described a separate study in which there were 36 patients identified
with a postoperative lower gastrointestinal leak. In that study, the majority of patients were
reoperated on at day 10 after their primary operation, with an average of 10.1 days, and a range of
2 to 50 days. The study group had 3 deaths, but the article did not provide any information regarding
when the reoperations occurred for those who died. Thus, neither article provides any evidence
regarding the specific significance of the 8- to 12-day range, and in fact, Fennern was reoperated on
within both studies' range and well below the maximums of 25 and 50 days. Moreover, appellants
do not allege that Fennern should have been diagnosed by day 5, which is the cut-off, according to
the first article, for a mortality rate of zero. (2)

 Therefore, while there is evidence that Fennern developed peritonitis, sepsis, and
ARDS, and while Dr. Camazine avers that there was no evidence of "significant" peritonitis or sepsis
as of April 5, Dr. Camazine has not shown sufficient basis for his opinion that Fennern's death was
caused by a four-day delay in diagnosis. The medical literature provided by Dr. Camazine is
not consistent with his testimony that survival is rare for reoperation occurring on day 12 following
the initial surgery, and gives no support for his opinion that a delay from day 8 to day 12 was
a substantial factor in bringing about the conditions that caused Fennern's death. Moreover,
Dr. Camazine did not set forth how his training or experience informed his conclusions regarding
the relationship between a 4-day delay and Fennern's death beyond his general observation that "the
longer you leave someone with an anastomotic leak, the less their chances of survival." Appellants
have not shown a reliable basis for Dr. Camazine's ultimate opinion as to Fennern's cause of death.

 In addition, the district court could have reasonably concluded that Dr. Camazine did
not sufficiently demonstrate a causal connection between the conditions of peritonitis, sepsis, and
ARDS and the pulmonary embolus or cardiac arrhythmia that allegedly caused Fennern's death. See
Gammill, 972 S.W.2d at 727-28 (affirming exclusion of expert testimony due to "analytical gap"
between data and opinion proffered). Regarding pulmonary embolus, which Dr. Camazine testified
was the probable cause of Fennern's death, Dr. Camazine averred the following:

[I]t is recognized in science and literature that one of the main risks of pulmonary
embolus is a long period of bed rest. In this case, had Mrs. Fennern not suffered her
lengthy illness, she would have been discharged in a prompt fashion and would have
been at home for a lengthy period of time engaged in the activities of daily living. 
She would not have developed thrombus in the deep veins of her pelvis that
eventually break off and move to the pulmonary system to result in cardiovascular
collapse had she not been hospitalized for a lengthy period of time. In this
connection, I would note that Dr. Whitehead considered pulmonary embolus at the
time of the event and treated it with TPA. This is a medication designed to dissolve
clots like a pulmonary system. Thus, the patient could have sustained a pulmonary
embolus that caused a cardiovascular arrest for long enough to sustain brain damage
but the evidence for pulmonary embolus was dissolved by the TPA and therefore not
found at autopsy.

Dr. Camazine provided no support other than his bare opinion that Whitehead's treatment of Fennern
resulted in pulmonary embolus, which then caused her death. Specifically, he relies on the assertion
that bed rest is "one of the main risks" of pulmonary embolus, the fact that Whitehead "considered"
the possibility of pulmonary embolus in his treatment of Fennern, and the argument that the absence
of evidence at the autopsy did not impact the possibility that Fennern "could have" sustained a
pulmonary embolus that resulted in her death.

 Regarding a cardiac arrhythmia, which Dr. Camazine testified was the other possible
cause of Fennern's death, Dr. Camazine averred the following:

There are . . . several risk factors for cardiac arrhythmia that were created by
Dr. Whitehead's negligence. One is weight gain. . . .


Second, the patient had a persistent tachycardia or elevated heart rate probably due to
the whole body swelling and the ongoing infection in the patient's body. At the time
of her death, her white blood cell count had come down from its peak levels but
was still elevated in a range that is significant for ongoing infection. This ongoing
infection was probably part of the cause for the patient's tachycardia. This
tachycardia put the patient at an increased risk of cardiac arrhythmia. Further, the
evidence shows that the patient's potassium was elevated at around the time of arrest
at 5.5 . . . . In this connection, the patient's lengthy infection, peritonitis, and sepsis
probably led to anemia and low blood pressure (lab work does show the patient is
anemic prior to death), which in turn compromised blood flow to the kidneys leading
to acute tubular necrosis which in turn inhibited the kidneys' ability to get potassium
out of the system which in turn led to an elevated potassium level which puts a
patient at risk of cardiac arrhythmia and asystole. Each of the steps I have just
described is basic information taught in medical school.

Dr. Camazine provided no support for his opinions regarding Whitehead's negligence causing
Fennern to suffer cardiac arrhythmia other than the existence of conditions--which, he alleges, were
"probably" caused by Whitehead's negligence--that are "risk factors" for cardiac arrhythmia.

 Even taking as true that the only possible causes for Fennern's death are pulmonary
embolus and cardiac arrhythmia, (3) Dr. Camazine has only averred that Whitehead's alleged
negligence probably increased Fennern's risk of developing either of the conditions that he thinks
may have caused Fennern's death. To constitute proximate cause, Whitehead's acts or omissions
must have been a "substantial factor" in bringing about Fennern's death. See Columbia Rio Grande
Healthcare, 284 S.W.3d at 860. The alleged causal connection must be based on "reasonable
medical probability," not mere conjecture, speculation, or possibility. See Arlington Mem'l Hosp.
Found., 991 S.W.2d at 922. Therefore, we conclude it was not error for the district court to
have determined that Dr. Camazine's opinion--that a four-day delay in diagnosis was the proximate
cause of Fennern's death--was speculative and contains an analytical gap, causing his opinion to
be unreliable. See Wiggs v. All Saints Health Sys., 124 S.W.3d 407, 412-14 (Tex. App.--Fort Worth
2003, pet. denied).

 The district court did not err by excluding Dr. Camazine's testimony as unreliable.
We affirm the judgment of the district court. (4)



 __________________________________________

 G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed: June 18, 2010

 
1. Jeffrey Fennern is the surviving husband, and Farah Fennern is a surviving daughter.
2. Neither article sets out the specific numbers of postoperative days when each of the
patients was diagnosed. We note, however, that the first study's selection of day 5 as the cut-off for
the mortality statistics leads to a reasonable inference that one of the patients in the study who died
had a reoperation on day 6.
3. Fennern's autopsy did not result in a conclusive identification of her cause of death.
4. Appellants do not contend that, with Dr. Camazine's testimony excluded, it was error to
grant Whitehead's motion for summary judgment.