Opinion issued August 15, 2019



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00657-CV

———————————

**8-PLUS PROPERTIES, LLC, Appellant**

**V.**

**INVESCO COMMERCIAL ENTERPRISES, LLC, Appellee**

---

**On Appeal from the 133rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-39745**

---

## MEMORANDUM OPINION

Appellant, 8-Plus Properties, LLC ("8-Plus"), challenges the trial court's judgment, entered after a jury trial, in favor of appellee, Invesco Commercial Enterprises, LLC ("Invesco"), on its claim against 8-Plus for specific performance under a contract to sell commercial property. In three issues, 8-Plus contends that

the evidence is legally and factually insufficient to support the jury's finding that 8-Plus agreed to sell the property at issue to Invesco and the trial court erred in instructing the jury.

We reverse and remand.

## Background

In its amended petition, Invesco alleged that, on January 19, 2015, it executed a written agreement (the "Contract") with 8-Plus to purchase a property located at 8600 Cullen Boulevard, Houston, Harris County, Texas (the "Property") for $62,500. On February 11, 2015, Invesco and 8-Plus executed an amended version of the Contract, which added an "as is" clause to section 7A.

Invesco delivered the executed Contract and $1,000 in earnest money to First American Title Company, the escrow agent designated in the Contract. First American Title Company issued a commitment for title insurance, which contained a schedule listing various documents 8-Plus was required to provide at or before closing, including a "Resolution of the Managers," the purpose of which was to "confirm who [was] authorized to execute documents on behalf of [8-Plus]." On March 4, 2015, First American Title Company's escrow officer sent an email to 8-Plus requesting the Resolution of Managers document, explaining it was the only thing the officer needed from 8-Plus before the closing on the Property. The officer further advised 8-Plus that "closing could not be scheduled and a closing

2

statement would not be prepared until the Resolution [of the Managers document] was provided."

As the scheduled closing date approached, Johnny Carroll, a "managing member" of 8-Plus, advised Invesco and First American Title Company that he was having trouble obtaining the Resolution of the Managers document because "his brother decided he no longer want[ed] to sell" the Property. But Johnny, nevertheless, assured Invesco and First American Title Company that the Resolution of the Managers document was "forthcoming." Ultimately, 8-Plus never provided a Resolution of the Managers document. After the scheduled closing date had passed, Johnny again assured Invesco that the document was "forthcoming." "Relying upon [Johnny's] promises and representations, [Invesco] allowed [8-Plus] additional time to perform its obligations under the [C]ontract." However, 8-Plus never furnished the Resolution of the Managers document and, thus, the parties were never able to close on the Property with First American Title Company pursuant to the Contract.

On May 29, 2015, Invesco sent an email to 8-Plus demanding performance pursuant to the Contract. 8-Plus did not respond. Thus, on June 10, 2015, Invesco sent 8-Plus a written notice of default and a demand for performance. In response to the notice and demand, Johnny called Invesco and stated that his family did not wish to sell the Property. Invesco reiterated its demand for 8-Plus to perform

3

pursuant to the Contract, but 8-Plus "repudiate[d] the [C]ontract and refused to perform." On July 2, 2015, Invesco tendered performance of its obligations pursuant to the Contract at First American Title Company, "including but not limited to, payment of the purchase price *via* wire transfer." However, "[d]espite numerous demands by [Invesco]," 8-Plus "continues to fail and refuse to sell the Property" pursuant to the parties' Contract.

Invesco brought claims against 8-Plus for specific performance, trespass to try title, breach of contract, and a declaratory judgment. 8-Plus filed a general denial and specific denial, asserting, among other things, that enforceability of the Contract was "conditioned upon 8-Plus's [other] member-managers approving the sale" and that 8-Plus's obligations to perform under the Contract were "conditional [on] a resolution to sell the Property being approved by 8-Plus's member[-]managers." It also asserted various affirmative defenses.

The parties filed cross-motions for summary judgment as a matter of law. Invesco argued, among other things, that Johnny had actual authority to execute the Contract on behalf of 8-Plus because he was designated as a "governing person" and "managing member" in 8-Plus's certificate of formation filed with the Texas Secretary of State. In contrast, 8-Plus argued that Johnny lacked authority to execute the Contract on behalf of 8-Plus without unanimous approval from the other seven members of 8-Plus and, thus, no enforceable contract was formed. The

4

trial court denied summary-judgment on all of Invesco's substantive claims, including the issue of Johnny's authority, and the case proceeded to trial before a jury.

At trial, Johnny testified that he is a member of 8-Plus, a limited liability company, and designated as its registered agent under the certificate of formation on file with the Texas Secretary of State. He also explained that 8-Plus, in its certificate of formation, elected to not have managers and to, instead, be governed by its members. The governing persons listed in the certificate of formation are Johnny and his siblings, who are the remaining members of 8-Plus. Johnny testified that 8-Plus was formed to "manage real estate that [his] dad left" the family when he passed away. Although 8-Plus had begun drafting a proposed company agreement to govern the affairs of the company, it was never completed so there was not one in place at the time the Contract was signed. However, Johnny testified that the members of 8-Plus "verbally" agreed that "to have anything . . . approved" required "all members [to] approve it, all the members."

Johnny further testified that he first learned that Invesco was interested in purchasing the Property when he received a phone call from his sister, Glory, who had spoken with a representative of Invesco named Matt Abdallah. Johnny explained that Glory forwarded Invesco's inquiry to him because he "handle[s] contracts" for 8-Plus. He further explained that he has a lot of experience in

5

"negotiating" government contracts, but not necessarily in negotiating commercial contracts such as the one at issue in this case.

When Johnny later called Abdallah about Invesco's interest in the Property, Abdallah asked him what 8-Plus would "want for the [P]roperty," and Johnny told him to "make [them] an offer" in writing. Johnny later received a written offer from Invesco to purchase the Property for $50,000. Johnny told Abdallah that $50,000 would not "even start" negotiations if he were to take that offer to his siblings. Johnny and Abdallah "negotiated a couple of times" and eventually agreed upon $62,500 as a "good price to submit to the company for approval from other members."

According to Johnny, he received a written contract from Invesco to purchase the Property for $62,500, and the Contract included a closing date of March 31, 2015. Johnny reviewed the Contract, proposed revisions, initialed pages where required, and signed the Contract on behalf of 8-Plus as a Limited Liability Company ("LLC") "member" on January 19, 2015. Johnny testified, however, that as far as he was concerned "[they] were still negotiating"; the Contract was was "a negotiating document," an "offer of negotiation" and "not a contract" because all of his siblings had not yet signed it. He further testified that, before the sale could close, "all [of his siblings'] signatures [needed to be] included on the closing documents." Johnny explained that he communicated to Abdallah that he did not

6

intend to sign any offers from Abdallah on behalf of the other members of 8-Plus. Nevertheless, Johnny did not propose a provision preventing the Contract from becoming binding unless and until all members of 8-Plus approve the transaction. Although he maintained that the Contract was "not a binding contract," Johnny admitted that he had read and understood the entire Contract before signing it, including the provision that stated, "[t]his [C]ontract is binding on the parties."

Further, on February 11, 2015, Johnny and Abdallah agreed to an "as is" amendment to the Contract. Regarding the addition of the "as is" clause, Johnny testified that "some of the members suggested [that he] do it." Johnny and Abdallah also decided to "clean up" the Contract, incorporating Johnny's handwritten revisions from January 19, 2015. Abdallah signed the Contract, again, for Invesco. And Johnny signed the Contract on behalf of 8-Plus as an "LLC member." However, Johnny testified that he told Abdallah at that time that he had "concerns" about his "family members not signing" because "not everybody [had] agreed to it." Even though he signed the amended Contract on February 11, 2015, he testified that he told Abdallah that he still needed his "other seven members to agree."

Johnny also explained that on both occasions that he signed the Contract, he told Abdallah that he needed him to "[s]end the offer back" with "signature lines for [his] siblings" "so [that] they can sign off on it" because he could "negotiate,"

7

but could not "sign for them." He further testified that, regarding the additional signatures from his siblings, Abdallah had told him "don't worry about it, do it at closing." Nevertheless, Johnny admitted that he did not attend the March 31, 2015 closing because he did not believe there was a "binding contract" to sell the Property.

Abdallah, an asset property manager for Invesco, testified that Invesco became interested in the Property because it is a parking lot adjacent to Farmer's Fresh Meat, which needed more parking spaces for its business. The owner of the Property was listed on the Harris County Appraisal District's website as Orenzer Carroll. He called Orenzer, who told him that she did not "handle these things," but she then put her daughter, Glory, on the phone. Abdallah spoke with Glory and told her that he was interested in purchasing the Property. Glory told him that she would pass along his information to her brother, Johnny, who was "the one who handle[d] all of [their] properties" and "the one in charge."

A few days later Johnny called Abdallah and introduced himself as calling on "behalf of 8-Plus Properties." Abdallah offered 8-Plus $50,000 for the Property, which, according to Abdallah, was twenty-five percent above fair market value. Johnny told him that was "something that [they] could work with" and asked Abdallah to put the offer in writing.

Abdallah used a standardized form promulgated by the Texas Association of Realtors and "simply filled in the blanks" for the names of the seller and buyer, the purchase price, and the closing date. Abdallah also indicated the purchase was for "all cash." A few days after their conversation, on January 8, 2015, Abdallah emailed a completed form to Johnny as Invesco's offer to 8-Plus for the purchase of the Property.

Upon receiving the email, Johnny called Abdallah to tell him "that price [was] not going to cut it" because it was "too low." When Abdallah asked him what price would be enough to "get the deal done" for him and his family, Johnny told him $70,000. Eventually, they settled on a purchase price of $62,500. Abdallah testified that he understood that he and Johnny had reached "a formal agreement." And according to Abdallah, at no point during their conversations did Johnny tell Abdallah that the other members of 8-Plus were not willing to sell. Abdallah understood that Johnny to have been negotiating "on behalf of 8-Plus." Abdallah testified that he revised the Contract to reflect the new agreed-upon purchase price for the Property and sent the revised Contract to Johnny by email. About eleven days later, Johnny returned a signed copy of the Contract to Abdallah, after removing "basically [sixty] percent of the [C]ontract" and also adding some additional language that he wanted included in the Contract.

9

Abdallah testified that he took the Contract to Abdullah Kamal, an owner and member of Invesco, for his review. Kamal ultimately initialed Johnny's changes and signed the Contract on behalf of Invesco. Abdallah believed this to be "the absolute final agreement" between Invesco and 8-Plus for the purchase of the Property. He took it, along with a check for the earnest money in the amount of $1,000 to First American Title Company. He further testified that he would not have "performed" these, and other,[1] "obligations as buyer" if he did not think there was a binding contract in place.

A couple of weeks later, Johnny called Abdallah "out of the blue" and asked him to meet in person on a "very urgent matter." At their meeting, Johnny disclosed to Abdallah that there had previously been a gas station on the Property and he requested that Invesco agree to an amendment to purchase the property "as is." At no point during their conversation did Johnny ever tell Abdallah that he needed approval from the other members of 8-Plus to sell the Property.

According to Abdallah, at all times during their discussions and negotiations, Johnny never mentioned that he needed approval from all of the members of 8-Plus to sell the Property. As Abdallah explained, "[i]t never even came up. He was acting under the official capacity of 8-Plus Properties as the managing member. He was the boss." And there was nothing in the Contract that

_____

[1] Abdallah also testified that he had a survey performed as required of Invesco under the Contract.

10

conditioned the sale of the Property upon the approval from the other members of 8-Plus. Abdallah further testified that Johnny never told him that he needed to add all eight members of 8-Plus to the signature page. However, Abdallah also testified that "of course [he] knew [that Johnny] was consulting [with] his family members and LLC members" and Abdallah agreed that he knew that Johnny's family would have a say in whether or not the property could be sold.

Abdallah additionally explained that, as the closing date approached, Johnny called him "many times" asking when they were "going to close" because he was "very eager to sell this piece of property." But Abdallah admitted he had never seen any signed document saying Johnny alone had the authority to sell the Property.

Kamal, an attorney and member of Invesco, testified that by the time he received the Contract for Invesco to review and sign, it had already been signed by "the seller." Before signing the Contract on behalf of Invesco, he performed due diligence to determine whether 8-Plus was a "real entity," whether the "person representing the entity ha[d] authority to do so," and whether "the nature of the agreement that they are agreeing to [was] within the scope of that entity." He said he visited the Texas Secretary of State's website and spoke with a representative of the office to confirm that 8-Plus was a member-managed LLC and that Johnny was a member-manager. He also confirmed that it was organized "for any lawful

11

purpose." Kamal further testified that he accepted and initialed all changes proposed by Johnny and signed the Contract on behalf of Invesco and as a member of that LLC.

Milton Carroll, Johnny's brother and another member of 8-Plus, testified that he had seen the certificate of formation for 8-Plus and was not aware of another agreement that governed the LLC. He further testified that Johnny told him about Invesco's offer to purchase the Property, but he and at least two other member-siblings were opposed to the sale. He testified that Johnny did not have the authority to execute the Contract on behalf of 8-Plus because all eight of the member-siblings must agree to sell any of 8-Plus's properties and "no one person can obligate the other seven [siblings] to anything." When asked if the certificate of formation limited Johnny's authority to act on behalf of 8-Plus, Milton answered that it "says what it says."

The trial court provided the parties with its proposed charge, which included the following question and instruction:

**QUESTION NO. 1**

Did 8-Plus agree to sell the real property located at 8600 Cullen Blvd., Houston, Texas, to Invesco?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

12

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

At the charge conference, 8-Plus objected to the exclusion of the following instruction along with Question No. 1, pursuant to Section 101.254 of the Texas Business Organizations Code,[2] and tendered the following proposed instruction to the trial court:

Each governing person of a limited liability company and each officer of a limited liability company vested with actual or apparent authority by the governing authority of the company is an agent of the company for purposes of carrying out the company's business.[3]

. . . .

---

[2]   *See* TEX. BUS. ORGS. CODE ANN. § 101.254.

[3]   This proposed instruction is a direct quote from Texas Business Organizations Code section 101.254(a). *See id.* § 101.254(a).

An act committed by an agent of a limited liability company for the purpose of apparently carrying out the ordinary course of business of the company, including the execution of an instrument, document, mortgage, or conveyance in the name of the company, binds the company unless:

> (1) the agent does not have actual authority to act for the company; and

> (2) the person with whom the agent is dealing has knowledge of the agent's lack of actual authority.[4]

. . . .

An act in the ordinary course of business is the normal routine in managing a trade or business, a regular course of procedure, or the habitual or mechanical performance of an established procedure.[5]

The trial court overruled 8-Plus's objections and refused these proposed instructions.

8-Plus also objected to submission of the following instruction in the trial court's charge on apparent authority:

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

---

[4]  This proposed instruction is a direct quote from Texas Business Organizations Code section 101.254(b). *See id.* § 101.254(b).

[5]  8-Plus cited an unpublished opinion from the federal district court for the Southern District of Texas for its authority for this instruction. *See St. Star Designs, LLC v. Gregory*, No. Civ. A. H-11-0915, 2011 WL 3925070, at *2 (S.D. Tex. Sept. 7, 2011).

Specifically, 8-Plus argued that the apparent authority language in the trial court's instruction was incorrect because Texas law requires a "reasonably prudent person" to "act[] with diligence and discretion to ascertain the agent's authority." Accordingly, 8-Plus submitted the following instruction on apparent authority to the trial court:

> Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person ***acting with diligence and discretion to ascertain the agent's authority and*** rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

(Emphasis added.) The trial court overruled 8-Plus's objection and refused its proposed instruction.

During deliberations, the jury submitted the following question to the trial court:

> Can one member of a member[-]managed LLC conduct business independently of other members in the absence of another document specifying who [can] and who cannot perform business.

The trial court provided the following answer:

> The Court under the law is not permitted to answer the question you presented. Please refer to and follow the instructions already given you and continue your deliberations.

15

After deliberating, the jury returned a verdict in favor of Invesco. It unanimously answered "Yes" to Question 1 regarding whether 8-Plus agreed to sell the Property to Invesco.

## Jury Charge Error

In its first issue, 8-Plus argues that the trial court erred in instructing the jury because it "committed harmful error by refusing 8-Plus's tendered instructions to Question No. 1."

### A.     Standard of Review

We review de novo whether an instruction or definition in a jury charge is legally correct. *Transcont'l Ins. Co. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010). If a charge is legally correct, then the trial court has broad discretion in submitting questions, instructions, and definitions. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). Accordingly, we review a trial court's decision to deny a requested instruction for an abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). One way a trial court may abuse its discretion is by failing to follow guiding rules and principles. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). An instruction is proper if it assists the jury, accurately states the law, and finds support in the pleadings and evidence. *Id.* at 855; *see also Gunn v. McCoy*, 554 S.W.3d 645, 675 (Tex. 2018).

16

However, even if we find error, we will reverse a judgment for charge error only if the error was harmful, meaning the error probably caused the rendition of an improper judgment or prevented a party from properly presenting the case on appeal. *Gunn*, 554 S.W.3d at 675; *Thota*, 366 S.W.3d at 687. Charge error is generally considered harmful if it relates to a contested, critical issue. *Hawley*, 284 S.W.3d at 856. In determining whether an erroneous instruction or definition probably caused an improper judgment or prevented proper presentation of a case to an appellate court, we examine the entire record. *Crump*, 330 S.W.3d at 225.

## B. Alleged Error

The trial court submitted to the jury the pattern jury instruction on actual and apparent authority, which provides:

> Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

> Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

TEXAS PATTERN JURY CHARGES: BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT § 101.4 (2012 ed.). 8-Plus argues that the trial court committed

17

reversible error by (1) "refusing to instruct the jury on the requirements for a member's actions to be binding on a limited liability company under Section 101.254 of the Texas Business Organizations Code"; and (2) instructing the jury with a "legally incorrect standard for apparent authority."

## 1. Refused Instructions Regarding Section 101.254

The Texas Business Organizations Code explains the authority of agents of a limited liability company ("LLC") as follows:

(a) Except as provided by this title and Title 1, each governing person of a limited liability company and each officer of a limited liability company vested with actual or apparent authority by the governing authority of the company is an agent of the company for purposes of carrying out the company's business.

(b) An act committed by an agent of a limited liability company described by Subsection (a) for the purpose of apparently carrying out the ordinary course of business of the company, including the execution of an instrument, document, mortgage, or conveyance in the name of the company, binds the company unless:

(1) the agent does not have actual authority to act for the company; and

(2) the person with whom the agent is dealing has knowledge of the agent's lack of actual authority.

(c) An act committed by an agent of a limited liability company described by Subsection (a) that is not apparently for carrying out the ordinary course of business of the company binds the company only if the act is authorized in accordance with this title.

TEX. BUS. ORGS. CODE ANN. § 101.254. "Governing person" is defined as "a person serving as part of the governing authority of an entity." *Id.* § 1.002(37). "[G]overning authority" with respect to a limited liability company is defined as:

> (1) the managers of the company, if the company's certificate of formation state that the company will have one or more managers; or
>
> (2) the members of the company, if the company's certificate of formation states that the company will not have managers.

*Id.* § 101.251.

The following two instructions submitted by 8-Plus and refused by the trial court directly track the language in Texas Business and Organizations Code section 101.254(a)–(b) regarding an LLC agent's authority to bind the LLC with his actions:

> Each governing person of a limited liability company and each officer of a limited liability company vested with actual or apparent authority by the governing authority of the company is an agent of the company for purposes of carrying out the company's business.[6]
>
> . . . .
>
> An act committed by an agent of a limited liability company for the purpose of apparently carrying out the ordinary course of business of the company, including the execution of an instrument, document, mortgage, or conveyance in the name of the company, binds the company unless:
>
> > (1) the agent does not have actual authority to act for the company; and

---

6      *See* TEX. BUS. ORGS. CODE ANN. § 101.254(a).

19

(2) the person with whom the agent is dealing has knowledge of the agent's lack of actual authority.[7]

8-Plus also argues that the trial court erred in omitting this additional instruction from Question No. 1 to the jury charge:

An act in the ordinary course of business is the normal routine in managing a trade or business, a regular course of procedure, or the habitual or mechanical performance of an established procedure.[8]

Although this instruction is not based on language in the statute, it is grounded in well-established statutory construction principles. The source relied upon by 8-Plus in support of this proposed instruction relies on definitions from Black's Law Dictionary. *See St. Star Designs, LLC v. Gregory*, Civ. Action No. H-11-0915, 2011 WL 3925070, at *2 (S.D. Tex. Sept. 7, 2011). Such reliance is appropriate where, as here, "a statute uses a word that it does not define." *See Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014). Under such circumstances, it is the court's "task[] to determine and apply the word's common, ordinary meaning." *Id.* And courts "look to a wide variety of sources, including dictionary definitions, treatises and commentaries, our own prior constructions of the word in other contexts." *Id.*

---

7       *See id.* § 101.254(b).

8       8-Plus cited an unpublished opinion from the federal district court for the Southern District of Texas for its authority for this instruction. *See St. Star Designs*, 2011 WL 3925070, at *2.

20

In this case, it is undisputed that Johnny is a member-manager of 8-Plus and a person with governing authority, as designated in 8-Plus's certificate of formation on file with the Texas Secretary of State. As a result, Johnny was acting as an agent for 8-Plus when he signed the Contract with Invesco, if "vested with actual or apparent authority" by 8-Plus to carry out the ordinary course of business for the company. *See* TEX. BUS. ORGS. CODE ANN. § 101.254(a). Presuming Johnny meets the statutory requirements for agency in this case, then 8-Plus is bound by his actions in executing the Contract with Invesco to purchase the Property *unless* Johnny lacked actual authority *and* Invesco had knowledge of Johnny's "lack of actual authority." *Id.* § 101.254(b).

The following three issues were hotly-disputed and pivotal fact issues at trial: (1) whether Johnny had actual authority to execute the Contract to purchase the Property, (2) whether Invesco had knowledge of Johnny's alleged lack of actual authority to execute the Contract, and (3) whether Johnny's actions in executing the Contract were within the ordinary course of business of 8-Plus.

Johnny is listed as a person with governing authority to act on behalf of 8-Plus in the company's certificate of formation. The certificate of formation further provides that the company was "formed . . . for the transaction of any and all lawful purposes for which a limited liability company may be organized under [the] Texas Business Organizations Code," although 8-Plus disputed that selling

21

property was within the "purpose" of the company and argued that Johnny did not have authority to act in selling the Property without unanimous approval from the other members. 8-Plus maintained throughout trial that there was a verbal agreement amongst its members that no member could take an action on behalf of the company without unanimous approval. But it is uncontested that there was no written agreement in place which provides for this governance.

In his testimony, Johnny insisted on several occasions that he informed Abdallah that he did not have authority to sell the Property without unanimous consent from the other members of 8-Plus and that the Contract needed a signature line for each member. However, Abdallah maintained that he was not aware that Johnny lacked authority to sign the agreement on behalf of 8-Plus. And he believed that Johnny had obtained any necessary approval on behalf of the other members, if required, before negotiating or acting on behalf of 8-Plus. Abdallah further testified that Johnny gave him no reason to believe that the Contract was not a final, binding agreement and that they even executed an "amendment" to the Contract after execution per Johnny's request and allegedly upon the insistence of his sister, Glory.

Nowhere in its brief or at trial did Invesco argue that section 101.254 does not apply in this case. In fact, at the charge conference, in objecting to the charge on other grounds, Invesco argued that "the agency issues in this case are governed

22

by the Texas Business Organizations Code under . . . Section 101.254(a) and (b) and (c)." Further, Invesco's argument that the instructions proposed by 8-Plus abrogate common law is without merit. 8-Plus does not argue that these instructions should have been given *in place* of the common law definitions of actual and apparent authority, but, rather, *in addition* to the specific statutory language at issue. And, a jury charge submitting liability under a statute should track the statutory language as closely as possible, although it may be altered to conform to the case and a court should not burden the jury with surplus instructions. *See Regal Fin. Co., Ltd. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 601 (Tex. 2010). In this case, the proposed instructions were not superfluous and would have aided the jury in its deliberations. This is supported by the jury's question to the trial court during deliberations which asked whether a single member's actions could bind an LLC.

We conclude that this conflicting evidence demonstrates that the evidence pertaining to 8-Plus's proposed jury instructions was hotly disputed. As such, the instructions proposed by 8-Plus pursuant to section 101.254 of the Texas Business Organizations Code would have aided the jury in answering Question No. 1 concerning whether 8-Plus agreed to sell the Property to Invesco. Accordingly, 8-Plus's proposed instructions were proper.

## 2. Apparent Authority Instruction

8-Plus also argues that the trial court "committed reversible error" in regard to Question No. 1 of the jury charge because it used "the legally incorrect standard for apparent authority under *Gaines v. Kelly*, 235 S.W.3d 179 (Tex. 2007)."

The trial court submitted the following instruction on apparent authority:

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

8-Plus objected to this instruction, and requested the following instruction be submitted to the jury instead, adding the language in bold from the *Gaines* opinion:

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person **acting with diligence and discretion to ascertain the agent's authority and** rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

(Emphasis added.) The trial court overruled 8-Plus's objection and refused its proposed instruction.

The language proposed by 8-Plus is taken directly from *Gaines*, in which the Texas Supreme Court set forth the standard for apparent authority as follows:

24

Apparent authority, we have said, is based on estoppel, arising "either from a principal knowingly permitting an agent to hold [himself] out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise." *Baptist Mem['l] Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998). We have further noted that the principal's full knowledge of all material facts is essential to establish a claim of apparent authority based on estoppel. *Rourke v. Garza*, 530 S.W.2d 794, 803 (Tex. 1975) (citing *Hallmark v. United Fid. Life Ins. Co.*, 155 Tex. 291, 286 S.W.2d 133 (1956)). Moreover, when making that determination, only the conduct of the principal is relevant. *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) (per curiam). Finally, the standard is that of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority. *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422, 427 (1953). Thus, to determine an agent's apparent authority we examine the conduct of the principal and the reasonableness of the third party's assumptions about authority.

*Gaines*, 235 S.W.3d at 182–83. And this Court has recognized that "reasonable diligence to ascertain [an] agent's authority" is part of the standard under Texas law for determining whether a person is reasonably prudent in the context of dealing with an agent with apparent authority.[9] *See Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 784, 785 (Tex. App.— Houston [1st Dist.] 2011, no pet.) (quoting *Gaines*, 235 S.W.3d at 182–83). However, in that case, because neither party objected to the instruction on apparent authority in the trial court's charge to the jury, the "jury was authorized, under the

---

[9] The cases relied upon by Invesco to the contrary pre-date *Gaines* or do not address any dispute over what standard should be applied to a reasonably prudent third-party in the context of an apparent-authority analysis.

25

charge given, to find apparent authority without evidence of . . . diligence and discretion." *Id.* at 788.

Here, 8-Plus did object to the trial court's failure to include the language from *Gaines* regarding the standard of "using diligence and discretion to ascertain the agent's authority" in the context of apparent authority. Accordingly, the instruction proposed by 8-Plus, tracking the language in the *Gaines* opinion, was proper.

## C. Harm Analysis

Even if we determine that a trial court committed jury-charge error, we will only reverse if the error was harmful. *See Gunn*, 554 S.W.3d at 675; *Thota*, 366 S.W.3d at 687. Charge error is generally considered harmful if it relates to a contested, critical issue. *Hawley*, 284 S.W.3d at 856.[10]

In this case, the jury presumably found that Johnny had actual or apparent authority to bind 8-Plus in unanimously answering "yes" to Question No. 1 of the trial court's charge asking if 8-Plus agreed to sell the Property to Invesco. And there is nothing that instructs the jury that if Johnny lacks actual authority and Invesco is aware that he lacks actual authority, that it could not find that 8-Plus

---

[10] Invesco asserts that the trial court, pursuant to its motion, struck 8-Plus's affirmative defense regarding authority. This is not evidenced by the record. Instead, the record reflects that the trial court granted a motion in limine to prevent 8-Plus from introducing new affirmative defenses at trial that had not been previously pled without first approaching the bench and requesting permission from the trial court. In granting this motion in limine, the trial court specifically explained that 8-Plus could "raise [its] affirmative defenses . . . [already] on file."

was bound by Johnny's actions under a theory of apparent authority. In other words, the instructions accompanying Question No. 1 of the jury charge allowed the jury to make a finding that 8-Plus agreed to sell the Property to Invesco without first determining whether Johnny lacked actual authority to bind 8-Plus and, if so, whether Invesco had knowledge that he lacked such authority. This omits a specific finding required by the statute governing agency in this case, which provides that an LLC is not bound by the acts of its agents if the agent acts without actual authority and the person dealing with the agent is aware that the agent lacks actual authority. *See* TEX. BUS. ORGS. CODE ANN. §101.254(b) (LLC bound by acts of agents *unless* agent lacks actual authority and "person with whom the agent is dealing has knowledge of the agent's lack of actual authority"). We cannot assume that the jury considered evidence about Invesco's knowledge regarding Johnny's authority without instructions advising the jury to do so. *See Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 170 (Tex. 2002).

Accordingly, we hold that the trial court's refusal to submit an instruction to Question No. 1 of the jury charge that required the jury to consider whether Johnny lacked actual authority and, if so, whether Invesco was aware that he lacked actual authority consistent with Texas Business Organizations Code section 101.254(b), was harmful error. Because we hold that error regarding this instruction was harmful, and reverse and remand on this ground, we need not reach the harm

27

analysis regarding 8-Plus's remaining allegations of charge error or its challenge to the judgment on legal and factual sufficiency grounds. TEX. R. APP. P. 47.1.

## Conclusion

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion. We dismiss all pending motions as moot.


Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.